616 S.E.2d 694

**Emma F. HESSENTHALER, Petitioner,**

v.

**TRI–COUNTY SISTER HELP, INC., Respondent.**

**No. 25650.**

Supreme Court of South Carolina.

Heard Nov. 21, 2002.
Decided May 12, 2003.
Reheard March 3, 2004.
Refiled Oct. 18, 2004.
Reheard Feb. 16, 2005.
Refiled July 18, 2005.

102

William Gary White, III, of Columbia, for Petitioner.

Chalmers C. Johnson, of Charleston, for Respondent.

Ashley B. Abel and Lisa Robette Claxton, both of Greenville, for Amicus Curiae.

Chief Justice TOAL:

Petitioner Emma F. Hessenthaler (Hessenthaler) brought a breach-of-contract action against her former employer, Respondent Tri–County Sister Help, Inc. (the Shelter), alleging she was constructively discharged in violation of a nondiscrimination provision in the Shelter's employee handbook. The jury awarded Hessenthaler $25,000 in damages. The trial court denied the Shelter's motions for a directed verdict and for a judgment notwithstanding the verdict. The court of appeals reversed, finding that the employee handbook did not constitute a contract. *Hessenthaler Tri–County Sister Help, Inc.*, Op. No.2001–UP–325 (S.C. Ct.App. filed June 19, 2001). After granting rehearing for a second time, we withdraw our two prior opinions on this matter and substitute them with this opinion. We affirm in result.

## FACTUAL/PROCEDURAL BACKGROUND

In 1984, Hessenthaler began working as a monitor at the Shelter, a place for women and children who are victims of domestic violence. By late 1995, Hessenthaler had advanced to the position of Shelter Director, a position directly below the Executive Director.

That same year, the Shelter hired a new Executive Director, Audrey Harrell (Harrell), an African–American woman. As soon as Harrell was hired, she began firing members of the

staff. At one point, she directed Hessenthaler, who is a white woman, to fire certain employees, also white women. Harrell hired two black women and one white woman to replace the fired employees.

According to Hessenthaler, her disputes with Harrell continued and escalated. One day, Hessenthaler told one of the new employees, a black woman, to operate the Shelter hotline. The employee began to scream at Hessenthaler, and another new employee, also a black woman, joined in. Hessenthaler reported the incident to Harrell and planned to file a grievance. But Hessenthaler testified that she was not permitted to file a grievance, and the next day, was told that she would no longer be supervising the two women.

Hessenthaler also testified that on January 1, 1996, someone called her at home to report that the Shelter's twenty-four-hour hotline was not being answered. Hessenthaler called Harrell to report the problem. Harrell demanded that Hessenthaler reveal the name of the person who informed her about the hotline. Hessenthaler refused to answer the question, said she had to go, and hung up the phone. Later, Hessenthaler called a board member to report the hotline situation and the conversation with Harrell.

The next day, Harrell met with Hessenthaler after work for three hours and forty-five minutes. Hessenthaler testified that Harrell told her that she was going to be punished; that she was going to be demoted from Shelter Director; that her office would become a bedroom; that Harrell would "destroy her"; and that hanging up the phone on her was "just like calling [Harrell] the 'n' word." Harrell suspended Hessenthaler for two days for insubordination, failure to assist the Executive Director in an investigation, and failure to follow the proper chain of command. Harrell told Hessenthaler that a board member would contact Hessenthaler to inform her whether or not she could return to work.

While on suspension, Hessenthaler experienced some health problems, including depression. She also had a hysterectomy, and later broke some ribs in a car accident. She periodically sent doctors' notes to the Shelter in support of her leave-of-

absence from January to mid-April. The Shelter accepted the notes and did not terminate Hessenthaler.

In February 1996, while Hessenthaler was on leave, Harrell sent Hessenthaler a new employee handbook. Hessenthaler testified that she never read the handbook because she was sick at the time. After some communication by mail,[1] however, Hessenthaler and Harrell finally met at the Shelter on May 8. During the meeting, Harrell proceeded to read the employee manual aloud to Hessenthaler.[2] Hessenthaler admitted that the handbook was read to her "cover to cover, page by page, word for word."

The manual contained a disclaimer in bold, all-capitalized letters, on the first page, which provided as follows:

**THE LANGUAGE USED IN THESE PERSONNEL POLICIES IS NOT INTENDED TO CREATE, NOR SHOULD IT BE INTERPRETED TO CREATE A LEGAL CONTRACT OR AGREEMENT BETWEEN [THE SHELTER] AND ANY OR ALL OF ITS EMPLOYEES. THIS DISCLAIMER TAKES PRECEDENCE OVER ANY STATEMENT IN THESE POLICIES.[3]**

Hessenthaler testified that she did not recall Harrell reading the disclaimer language.

The handbook also contained a nondiscrimination provision, which provided:

---

1. Among other things, Harrell sent Hessenthaler a job offer, which included the following responsibilities: (1) train Shelter staff and volunteers on Shelter policies and procedures; (2) ensure that these policies and procedures are followed by Shelter residents; (3) provide general facility maintenance and security management; (4) meet with Shelter clients weekly to discuss any problems/concerns regarding the Shelter; (5) recommend Shelter purchases to Assistant Director; (6) facilitate group on Shelter orientation and house rules with residents; (7) ensure that appropriate codes and standards are met; (8) purchase approved groceries for Shelter; and (9) other duties as assigned.

2. It is unclear as to why Hessenthaler did not read the handbook herself.

3. We recognize that the disclaimer, as written here, appears larger than it appears in the actual handbook.

[The Shelter] is an equal opportunity employer. All decisions, including hiring, training, and promotion, are made without regard to race, color, religion, national origin, sex, age, handicap, sexual preference, or any other protected status.

After the handbook was read aloud, Hessenthaler was offered the position as Shelter Manager, which included eleven more requirements than the job offered earlier.[4] Hessenthaler testified that she was told that she needed to get a college degree, and that she would also have to assume the responsibilities of volunteer coordinator. Hessenthaler testified she felt as though it would take eight people to do all of that work.

Hessenthaler left the meeting, telling Harrell that, due to all of the job requirements, she would have to think about whether she would accept the position. Hessenthaler did not return to work by May 13 (her deadline for responding to Harrell's latest job offer) and later discovered that she had been fired.

Hessenthaler brought a breach-of-contract action against the Shelter alleging she was constructively discharged in violation of the nondiscrimination provision in the Shelter's employee handbook. The jury awarded her $25,000 in damages. The Shelter's motions for a directed verdict and for judgment notwithstanding the verdict were denied. The court of appeals reversed, holding that the employee handbook did not constitute a contract, and therefore the trial court erred in denying the Shelter's motions. *Hessenthaler v. Tri–County*

---

4. The requirements included the following: (1) recruit, train, and motivate volunteers; (2) assess the need for volunteers and coordinate volunteer schedule to ensure twenty-four hour coverage and other related client services; (3) assist public relations coordinator to establish a Speaker's Bureau to promote public awareness and community education on domestic violence; (4) serve as speaker for the Bureau; (5) receive and process all non-monetary donations; (6) maintain appropriate statistics and logs on volunteers and complete required reports; (7) act as PR coordinator in development and distribution of newsletter; (8) assist in fund-raising activities; (9) solicit donations from various groups and organizations; (10) design and coordinate an incentive award program for volunteers; and (11) coordinate mass mailings to churches, social and professional clubs, and organizations in York, Lancaster and Chester Counties.

*Sister Help, Inc.,* Op. No. 2001–UP–325 (S.C. Ct.App. filed June 19, 2001).

After granting certiorari, we reversed, holding that the question of whether the handbook created an enforceable contract was properly submitted to the jury. *Hessenthaler v. Tri–County Sister Help, Inc.,* Op. No. 25650 (S.C. Sup.Ct. filed May 12, 2003) (Shearouse Adv. Sh. No. 18 at 50). Rehearing was granted, and following oral argument, we withdrew the initial opinion and substituted it with a new opinion in which we affirmed the court of appeals' decision in result. *Hessenthaler v. Tri–County Sister Help, Inc.,* Op. No. 25650 (S.C. Sup.Ct. filed Oct. 18, 2004) (Shearouse Adv. Sh. No. 40 at 14).

After granting rehearing for a second time, we now consider the following issue for review:

Did the court of appeals err in holding that the employee handbook did not constitute a contract?

## LAW/ANALYSIS

### Standard of Review

When ruling on motions for directed verdict or judgment notwithstanding the verdict, the trial court must view the evidence and its reasonable inferences in the light most favorable to the party opposing the motions. *Jinks v. Richland County,* 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003). The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt. *Id.* On review, this Court will reverse the trial courts ruling only when there is no evidence to support it. *Id.*

### Discussion

Hessenthaler contends that the court of appeals erred in holding that the employee handbook did not constitute a contract. We disagree.

In general, an at-will employee may be terminated at any time for any reason or for no reason, with or without cause. *Stiles v. Am. Gen. Life Ins. Co.,* 335 S.C. 222, 224, 516

S.E.2d 449, 450 (1999). But when an employee's at-will status has been altered by the terms of an employee handbook, an employee, when fired, may bring a cause of action for wrongful discharge based on breach of contract. *Conner v. City of Forest Acres,* 348 S.C. 454, 463, 560 S.E.2d 606, 610 (2002).

■ If an employer wishes to issue an employee handbook or manual without being bound by it and with a desire to maintain the at-will employment relationship, the employer must insert a conspicuous disclaimer into the handbook. *Small v. Springs Indus., Inc.,* 292 S.C. 481, 485, 357 S.E.2d 452, 455 (1987). This Court has held that a disclaimer appearing in bold, capitalized letters, in a prominent position, is conspicuous.[5] *Marr v. City of Columbia,* 307 S.C. 545, 547, 416 S.E.2d 615, 616 (1992); *cf. Johnson v. First Carolina Fin. Corp.,* 305 S.C. 556, 409 S.E.2d 804 (Ct.App.1991) (finding disclaimer appearing in all-capitalized letters, in a prominent position, conspicuous).

■ The issue of whether an employee handbook constitutes a contract should be submitted to the jury when the issue of the contract's existence is questioned and the evidence is either conflicting or is capable of more than one inference. *Small,* 292 S.C. at 483, 357 S.E.2d at 454; *Williams v. Riedman,* 339 S.C. 251, 259, 529 S.E.2d 28, 32 (Ct.App.2000). In most instances, judgment as a matter of law is inappropriate when a handbook contains both a disclaimer and promises. *Fleming v. Borden,* 316 S.C. 452, 464, 450 S.E.2d 589, 596 (1994). But a " 'court should intervene to resolve the handbook issue as a matter of law ... if the handbook statements and the disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise either does or does not exist.' " *Id.* (quoting Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers,* 13 Indus. Rel. L.J. 326, 375–76 (1991–92)); *cf. Horton v. Darby Elec. Co.,* 360 S.C. 58, 67–68, 599 S.E.2d 456, 461 (2004) (holding, as a matter of law, that a

---

5. The General Assembly recently passed legislation requiring disclaimers to be in underlined, capitalized letters, appearing on the first page of the handbook, and signed by the employee. S.C.Code Ann. § 41–1–110 (Supp.2004).

handbook containing conspicuous disclaimers and a non-mandatory discipline procedure did not alter at-will status).

■ Mandatory, progressive discipline procedures may constitute enforceable promises. *See, e.g., Conner,* 348 S.C. at 464, 560 S.E.2d at 611 (holding that a handbook containing both disclaimers and a mandatory discipline procedure created a jury issue); *Leahy v. Starflo Corp.,* 314 S.C. 546, 548–49, 431 S.E.2d 567, 568 (1993) (holding that an employer was contractually bound by the mandatory disciplinary procedure). Such procedures typically provide that an employee may be fired only after certain steps are taken. When definite and mandatory, these procedures impose a limitation on the employer's right to terminate an employee at any time, for any reason.

■ In the present case, the employee handbook has a disclaimer on the front page, in bold, capitalized letters. Because the disclaimer appears on the front page of the handbook, in bold, capitalized letters, we hold that the disclaimer is conspicuous as a matter of law.[6] *Marr,* 307 S.C. at 547, 416 S.E.2d at 616; *Johnson,* 305 S.C. at 560, 409 S.E.2d at 806.

■ Finding the disclaimer to be conspicuous as a matter of law, we next turn to the question of whether the handbook contains a promise. Hessenthaler contends that the nondiscrimination provision constituted a promise, and that she was fired in violation of that promise. The provision provides:

---

**6.** Although Hessenthaler may not have appreciated the conspicuousness of the disclaimer because it was read aloud to her, she had actual knowledge of the disclaimer and its contents. She admitted that the handbook was read aloud to her, "cover to cover, page by page, word for word." Her testimony that she does not remember the disclaimer language does not change the fact that it was conspicuous and was read aloud to her. In addition, other sections of the handbook affirmed that employment remained at-will. For example, a section of the handbook, titled " 'At-will' Employment," states: "[the Shelter's] policy forbids guaranteed employment for any specified duration for any [Shelter] employee. Exceptions to this policy may occur only with the authorization of the [Shelter's] Board of Directors." There is no evidence in the record that the Board of Directors authorized an exception to this policy.

[The Shelter] is an equal opportunity employer. All decisions, including hiring, training, and promotion, are made without regard to race, color, religion, national origin, sex, age, handicap, sexual preference, or any other protected status.

 We hold that this provision does not constitute a promise altering the at-will employment relationship and giving rise to a breach-of-contract claim. *See McKenzie v. Lunds, Inc.*, 63 F.Supp.2d 986, 1003 (D.Minn.1999) (holding that nondiscrimination policy statements in employee handbook are legally insufficient to sustain a breach-of-contract claim; such policies are too indefinite to form a contract between employer and employee); *Cherella v. Phoenix Technologies Ltd.*, 32 Mass.App.Ct. 919, 586 N.E.2d 29, 31 (1992) (holding that an equal opportunity policy announced in an employee handbook did not establish contractual rights supporting a breach-of-contract claim). Unlike a mandatory, progressive discipline procedure, a general policy statement of nondiscrimination does not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired.[7]

 To be enforceable in contract, general policy statements must be definitive in nature, promising specific treatment in specific situations. *See, e.g., Ex parte Amoco Fabrics & Fiber Co.*, 729 So.2d 336, 339 (Ala.1998) ("[to] become a binding promise, the language used in the handbook ... must be specific enough to constitute an actual offer rather than a

---

7. The discipline section in the Shelter's handbook did not contain any promises. This section, entitled "Corrective/Disciplinary Action," provides:

 All [Shelter] personnel are required to meet acceptable performance standards and to comply with the policies set forth in this handbook. Failure may result in corrective or disciplinary action, including termination. [The Shelter] reserves the right to terminate an employee at any time when, in the opinion of the Executive Director, a termination is in [the Shelter's] best interests.

 Because employees could be fired "at any time" and for any reason that is in the Shelter's "best interests," this section reiterated that employment remained at-will.

mere general statement of policy") (internal quotations omitted); *Ross v. Times Mirror, Inc.,* 164 Vt. 13, 665 A.2d 580, 584 (1995) ("[o]nly those policies which are definitive in form, communicated to the employees, and demonstrate an objective manifestation of the employer's intent to bind itself will be enforced"); *cf. Bookman v. Shakespeare Co.,* 314 S.C. 146, 148–49, 442 S.E.2d 183, 184 (Ct.App.1994) (finding that a sexual harassment policy contained a promise to "promptly and carefully" investigate complaints of sexual harassment). The nondiscrimination provision in this case was not specific and did not make any promises regarding disciplinary procedure or termination decisions. Therefore, we hold that the handbook did not contain promises enforceable in contract.

Accordingly, we conclude that the evidence in this case leads to only one inference: the handbook does not constitute a contract. Therefore, the issue of whether the handbook constituted a contract should not have been submitted to the jury. *See Small,* 292 S.C. at 483, 357 S.E.2d at 454 (holding that the issue of whether a contract exists should be submitted to the jury when the existence of the contract is in question and the evidence is either conflicting or admits of more than one inference).

### Conclusion

Because the Shelter's handbook contained a conspicuous disclaimer, of which Hessenthaler had actual notice, and because the handbook did not contain any promissory language altering the employment at-will relationship, we hold that the handbook did not constitute a contract. Therefore, the Shelter's post-trial motions should have been granted.

Accordingly, the court of appeals' decision is affirmed in result.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.