634 S.E.2d 15

**Cynthia K. GRANT, Appellant,**

v.

**MOUNT VERNON MILLS, INC., Respondent.**

**No. 4122.**

Court of Appeals of South Carolina.

Heard May 11, 2006.
Decided June 12, 2006.
Rehearing Denied Aug. 25, 2006.

---

2. We decide this case without oral argument pursuant to Rule 215, SCACR.

Candy Kern–Fuller, of Piedmont, for Appellant.

Thomas A. Bright, of Greenville, for Respondent.

KITTREDGE, J.

This is a breach of contract action based on an employee handbook. The employee, Cynthia K. Grant, appeals from the circuit court's grant of summary judgment in favor of Mount Vernon Mills, Inc. We affirm and hold that the termination provisions in the employee handbook did not apply to Grant (as a salaried employee), and that in any event, the termination policy provisions of the handbook are permissive in nature and did not alter the at-will relationship.

## I.

We apply the same standard as the circuit court when reviewing the grant of a summary judgment motion: sum-

mary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *Fleming v. Rose,* 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002). To determine whether any material fact exists, the evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. *South Carolina Prop. & Cas. Guar. Ass'n v. Yensen,* 345 S.C. 512, 518, 548 S.E.2d 880, 883 (Ct.App.2001).

Once the party moving for summary judgment meets the initial burden of showing the absence of a genuine issue as to any material fact, the nonmoving party may not simply rest on the mere allegations contained in the pleadings. *Peterson v. W. Am. Ins. Co.,* 336 S.C. 89, 94, 518 S.E.2d 608, 610 (Ct.App. 1999). "Rather, the nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Id.* "The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder." *George v. Fabri,* 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001).

## II.

In 1996, Grant began her salaried employment with Mount Vernon as a Pension Benefits Manager. Grant's duties included processing monthly pensions payroll, conducting interviews with plan participants, and reviewing termination packages for terminated employees. Grant received a copy of the employee handbook.

The employee handbook contains numerous policies, including Employment Policy and Practice, Union Policy, Relocation Policy, Jury Duty, Terminations, Employment of Family Relatives, and so forth. Each policy in the manual has—at the top of the page—the term **"COVERAGE."** The policies apply to a variety of employee classifications. Some policies apply to "ALL EMPLOYEES"; some policies apply to "SALARIED EMPLOYEES"; some apply to "SALARIED EMPLOY-EES—EXEMPT AND NONEXEMPT"; some apply to "HOURLY EMPLOYEES"; some apply to "HOURLY NON-EXEMPT EMPLOYEES"; and one policy applies to "FIRST LINE SUPERVISORS." As noted, Grant was a salaried employee.

At issue here is the handbook's termination policy that provides **"COVERAGE"** for "HOURLY NONEXEMPT EMPLOYEES" and states in relevant part:

## I. *Policy*

It is the policy of the Company to attempt to be fair and just in all dealings with employees. For purposes of this policy, a termination is the result of any action initiated by the employee or the Company whereby the service record of the employee is broken.

. . . .

## B. *Discipline*

### 1. *Notice of Warnings*

a) Warnings are *normally* given as a result of an employee's unsatisfactory conduct or performance. The purpose of the warning is to serve notice to the employee that a continuation of the practice may result in discharge and to advise the employee that a change in conduct or performance must be made.

b) Warnings *should be* administered by the employee's immediate supervisor and should be straight forward and sincere. The supervisor should assume the responsibility and attitude of being helpful.

. . . .

### 2. *Discharge*

a) The three warnings and final improper conduct or performance will result in discharge if all four take place in a twelve consecutive month period.

. . . .

d) Immediate discharge

. . . .

4) Offenses—It is not the Company's intent to list in detail everything that an employee should or should not do under all circumstances. The following offenses are only examples of the types of conduct which could result in immediate discharge:

. . . .

 d) Creating discord or lack of harmony;....
(emphasis added).

On September 13, 2000, Grant met with three of her supervisors, Kent Harris, Ned Cochrane, and Gary Williams. Grant was terminated, effective immediately. The supervisors told Grant the reasons for her termination, and those reasons relate to their perception of Grant's poor work performance and her creating discord and lack of harmony in the workplace. Harris informed Grant she was terminated for her performance problems and lack of effort to work in a team environment within the corporate setting. Further, he stated she consistently displayed a poor attitude as evidenced by various emails she sent. In one of those emails Grant complained about being asked to perform employee interviews. She concluded by asking, "So do we just get the crappy work dumped on us?" In addition to Grant's supervisors' belief of her negative attitude towards employees and her work, Harris stated Grant performed her job poorly.

Grant filed suit in the circuit court alleging race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as well as state claims for breach of contract, breach of contract accompanied by fraudulent act, and breach of the covenant of good faith and fair dealing.

Mount Vernon removed the action to federal district court and filed a motion for summary judgment on all claims. The federal district court granted Mount Vernon summary judgment as to the federal claims and remanded the various contract claims to state court.

On remand to state court, Mount Vernon moved for summary judgment. Mount Vernon alleged the various contract claims were premised on the existence of an employment contract, and no contract existed as a matter of law because Grant was employed at-will. Mount Vernon maintained the employee handbook policy plainly stated the termination policy only applied to hourly nonexempt employees, and Grant was a salaried employee. Mount Vernon contended that because the termination policy did not apply to Grant, her at-will status was not altered. Accordingly, Mount Vernon claimed Grant's breach of contract claims failed as a matter of law.

Grant countered that during her employment she reviewed various salaried employee files that contained written warnings prior to termination. Grant also submitted various affidavits from salaried employees who stated they received written warnings prior to termination. Further, Grant submitted affidavits from two managers who stated they gave written warnings to salaried employees prior to termination. Grant's position was and remains that if other salaried employees received warnings, so should she.

Grant additionally relied on Mount Vernon's failure to insert a conspicuous disclaimer in the handbook to express its desire to maintain the at-will employment relationship.[1] Therefore, Grant contended that a question of fact existed as to whether the handbook created a binding contract, meaning Grant could only be fired for cause.

The circuit court granted Mount Vernon summary judgment. The circuit court reasoned the termination policy stated that coverage was for hourly nonexempt employees and because Grant was a salaried employee no ambiguity existed as to the fact she fell outside the scope of the policy. Therefore, the circuit court found the employee handbook did not create a contract of employment that modified Grant's at-will status. Moreover, the circuit court rejected Grant's reliance on Mount Vernon's decision to give warnings to other at-will employees and not her. This appeal followed.

### III.

Grant maintains the circuit court erred in concluding Mount Vernon's employee handbook, as a matter of law, did not alter Grant's status as an at-will employee. We disagree.

South Carolina has long recognized the doctrine of employment at-will. *Conner v. City of Forest Acres*, 363 S.C. 460, 471, 611 S.E.2d 905, 910–11 (2005) (*Conner II*); *Shealy v. Fowler*, 182 S.C. 81, 87, 188 S.E. 499, 502 (1936) ("[a] contract for permanent employment, so long as it is satisfactorily

---

1. The title page of the handbook (entitled "Employee Policies and Procedures On–Line Guide") states that the "on-line policy guide is not intended to bind the Company or any employee to a specific period of employment." This language was neither bold nor capitalized.

performed, which is not supported by any consideration other than the obligation of service to be performed on the one hand and wages to be paid on the other, is terminable at the pleasure of either party."). This doctrine allows either party to terminate the employment "for any reason or no reason" without being subject to a claim for breach of contract, subject to narrow exceptions and prohibitions against illegal discrimination which are not present here. *Horton v. Darby Elec. Co., Inc.*, 360 S.C. 58, 67, 599 S.E.2d 456, 460 (2004); *see also Conner II*, 363 S.C. at 471, 611 S.E.2d at 910. The at-will employment doctrine is essentially an economic incentive that provides critically needed flexibility in the marketplace. *Prescott v. Farmers Tel. Co-op., Inc.*, 335 S.C. 330, 334–35, 516 S.E.2d 923, 925 (1999).

■ When the at-will status of an employee is altered by the terms of an employee handbook, however, a contract may arise allowing for a cause of action for wrongful discharge. *Small v. Springs Indus., Inc.*, 292 S.C. 481, 484, 357 S.E.2d 452, 454 (1987).

When the evidence conflicts or is capable of more than one inference, the issue of whether an employee handbook constitutes a contract should be submitted to the jury; however, " 'a court should intervene to resolve the handbook issue as a matter of law ... if the handbook statements and the disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise either does or does not exist.' " *Hessenthaler v. Tri–County Sister Help, Inc.*, 365 S.C. 101, 108, 616 S.E.2d 694, 697 (2005) (quoting Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers*, 13 Indus. Rel. L.J. 326, 375–76 (1991–92)).

■ The typical handbook employment case may be resolved by making three determinations. A handbook forms an employment contract when: (1) the handbook provision(s) and procedure(s) in question apply to the employee, (2) the handbook sets out procedures binding on the employer, and (3) the handbook does not contain a conspicuous and appropriate disclaimer. *See Conner II*, 363 S.C. at 472, 611 S.E.2d at 911; *see also Williams v. Riedman*, 339 S.C. 251, 259–60, 529 S.E.2d 28, 32 (Ct.App.2000) (citing *Miller v. Schmid Labs., Inc.*, 307 S.C. 140, 414 S.E.2d 126 (1992)).

In determining whether the handbook sets out procedures that bind an employer, we must first determine—because of the procedural posture of this case—whether the employee is covered by the policy provision in question. If the employee is not covered, then the handbook would not form the basis of an employment contract.

Assuming an employee is covered by the relevant provision in the handbook, we next determine whether the handbook sets out binding procedures on the employer. In this regard, in the absence of a conspicuous and appropriate disclaimer, if the language in the handbook sets out mandatory, progressive discipline procedures, those procedures alter the at-will employment relationship. When an employer discharges a covered employee without adhering to the mandatory procedures, the employee may maintain an action for wrongful discharge against the employer. *See Hessenthaler*, 365 S.C. at 108–09, 616 S.E.2d at 697–98 (citing *Conner v. City of Forest Acres*, 348 S.C. 454, 463–64, 560 S.E.2d 606, 610–11 (2002) (*Conner I* )).

Mandatory discipline procedures "typically provide that an employee may be fired only after certain steps are taken. When definite and mandatory, these procedures impose a limitation on the employer's right to terminate an employee at any time, for any reason." *Hessenthaler*, 365 S.C. at 109, 616 S.E.2d at 698. Permissive language in an employee handbook, on the other hand, does not alter an employee's at-will status. *See Horton* 360 S.C. at 67–68, 599 S.E.2d at 461 (affirming summary judgment for employer when handbook provided discipline procedures that contained permissive language).

## A. Mount Vernon's employee handbook termination policy does not apply to Grant, a salaried employee.

Grant contends a jury question exists as to whether the employee handbook's termination policy applies to her. We disagree.

The employee handbook's termination policy unambiguously states that it applies to hourly nonexempt employees. Grant was a salaried, not an hourly, employee. According to Grant, she was a "salaried non-exempt employee." App. Br. at 10.

Grant focuses exclusively on the exempt versus nonexempt issue.[2] We need not reach the issue of whether Grant was exempt or nonexempt, for she was indisputably not an hourly employee. Because Grant was not an *hourly* nonexempt employee, the termination policy in the handbook did not apply to her.

■ Grant additionally argues that because the termination provision provides that the company policy is to be "fair and just in all dealings with employees," the termination provision applies to all employees, including salaried and hourly employees. The phrase "employees" in the body of the provision may not be properly read to broaden the coverage beyond that clearly set forth in the heading of the policy. This general policy statement—to be "fair and just"—does not somehow expand the class of Mount Vernon employees to whom this provision applies. This provision, by unmistakable language, is limited to hourly nonexempt employees.

■ Beyond this, the law does not sanction the leap advocated by Grant. For a general policy statement to be enforceable as a contract, the statement "must be definitive in nature, promising specific treatment in specific situations." *Hessenthaler*, 365 S.C. at 110, 616 S.E.2d at 698 (finding that because nondiscrimination provision was not specific and did not make any promises regarding disciplinary procedure or termination decisions, the handbook did not contain promises enforceable as a contract). The policy statement of Mount Vernon to be "fair and just" does not create an expectation that employment is guaranteed or that a particular process must be complied with before an employee is terminated. Consequently, the policy statement does not create a contract or otherwise alter Grant's at-will status.

---

2. The parties have not developed the status of Grant as exempt or nonexempt as significant to a resolution of this appeal. From our review of the record, it appears this issue may have been relevant in the adjudication of Grant's previously dismissed federal claims. For example, Grant submitted an affidavit in opposition to the summary judgment motion filed in federal court, in which Grant's expert opined that, for purposes of exemption from the overtime requirements of the Fair Labor Standards Act, Grant was "not an 'exempt' employee" with Mount Vernon.

Grant seeks to avoid the coverage limitation in the termination policy by claiming that her termination is governed by the "ATTENDANCE" policy, which applies to "ALL EMPLOYEES." This argument finds insufficient traction in the record. Grant recalled in her deposition testimony that the reason given at the September 13, 2000, meeting for her termination was that she was "not a team player." The balance of the record is consistent with Grant's recollection of the September 13 meeting in which she was terminated for her poor attitude and "not working as part of a team." Grant points to the September 13 memorandum of Gary Williams which contains, among many other things, a reference to Grant's propensity for arriving late for work and leaving early as "one contributing factor to the overall problem—an example of how her attitude has affected her performance [at Mount Vernon]."

We agree with the assessment of the circuit court that the language of the attendance policy would create an issue of fact if the evidence could reasonably support the conclusion that Grant was terminated for attendance reasons. The evidence (in a light most favorable to Grant) establishes, however, that Grant's alleged attendance related issues were only an adjunct in the decision to terminate her. As former Chief Justice Littlejohn observed, we are not "required to single out some one morsel of evidence and attach to it great significance when patently the evidence is introduced solely in a vain attempt to create an issue of fact that is not genuine." *Main v. Corley,* 281 S.C. 525, 527, 316 S.E.2d 406, 407 (1984).

### B. An employee handbook couched in permissive language does not alter the at-will employment relationship.

Although Grant may not avail herself of the termination policy due to her status as a salaried employee, we address Grant's contention that a handbook (whether couched in mandatory or permissive language) always alters the at-will relationship of the employer and employee absent a conspicuous disclaimer to the contrary. In support of her argument, Grant cites to the supreme court's statement in *Conner I* "that if an employer wishes to issue written policies, but intends to continue at-will employment [and not be bound by the polices],

the employer must insert a conspicuous disclaimer into the handbook." *Conner I,* 348 S.C. at 463, 560 S.E.2d at 611.

Grant, however, overlooks that the analysis in *Conner I* is based upon mandatory language that binds the employer. *See Conner I,* 348 S.C. at 464, 560 S.E.2d at 611. The supreme court observed in *Conner I* that "[i]t is patently unjust to allow an employer to couch a handbook, bulletin, or other similar material in mandatory terms and then allow him to ignore these very policies." *Conner I,* 348 S.C. at 463, 560 S.E.2d at 610 (quoting *Small v. Springs Indus., Inc.,* 292 S.C. at 485, 357 S.E.2d at 455).

In the present case, because nothing in the employee handbook outlined progressive disciplinary procedures in mandatory terms, the presumption that the employment was at-will was not rebutted and no disclaimer was needed. Accordingly, we hold the handbook did not contain promises enforceable in contract.

Even assuming Grant may avail herself of Mount Vernon's termination policy, her contract claims must nevertheless fail. The permissive nature of the termination policy compels this result. Nothing in the employee handbook required Mount Vernon to give warnings to an employee before termination. The handbook provides: "Warnings are *normally* given as a result of an employee's unsatisfactory conduct or performance." (emphasis added). Moreover, the handbook states that if a warning is given then "[w]arnings should be administered by the employee's immediate supervisor and should be straight forward and sincere." Therefore, a plain reading of the handbook shows that a supervisor may give a warning, but is not required to do so. If a warning is given, then the handbook provides procedures on how the warning should be administered.[3]

---

3. This serves as an additional sustaining ground. *See I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 419, 526 S.E.2d 716, 723 (2000) ("[A] respondent ... may raise on appeal any additional reasons the appellate court should affirm the lower court's ruling, regardless of whether those reasons have been presented to or ruled on by the lower court.").

## C. Grant's status as an at-will employee is not altered by Mount Vernon's election to give a warning to other salaried employees.

Grant's final argument is premised on the notion that an employer may not treat at-will employees differently. Grant points to evidence of other salaried employees receiving warnings. If other presumably at-will employees received warnings instead of dismissal, then Grant contends she is *legally* entitled to the same consideration. Although the law prohibits illegal discrimination, Grant makes no such claim to us. The record provides little in terms of the at-will salaried employees who were given warnings. We do not know the tenure of these employees, Mount Vernon's perception of the value of these employees, and the nature of the alleged misconduct of these employees. We decline to speculate that the circumstances of these examples of salaried employees receiving warnings mirror Grant's situation.

We agree with the circuit court that Grant's reference to other salaried employees receiving warnings does not create a question of fact. Absent a claim of illegal discrimination, an employee's status as an at-will employee is not altered by an employer's decision to give a warning to other at-will employees.

The rule could not be otherwise without wreaking havoc on the at-will employment doctrine. Employers routinely give warnings to at-will employees when no warning is legally required. But those at-will employees who are summarily fired and do not receive warnings may not (absent illegal discrimination) bootstrap an employer's unrelated judgment in another employee's situation to alter the at-will relationship and create a contract of employment. From the employer's perspective, that is the essence of the at-will employment relationship.

Say, for example, an employer has two at-will employees who have committed the same infraction and assume the absence of illegal discrimination. Employee A has worked for employer for ten years, and employer perceives employee A as a long time valued employee. Employer elects to give employee A a warning. Assume employee B has worked for employer for one year and employer perceives employee B as only a marginally adequate employee. Employer elects to fire

employee B. Does employer's decision to give employee A a warning alter employee B's at-will status, entitling employee B to a warning? The answer is "no." The result would be the same if we reversed the hypothetical. Though illogical, the at-will employment doctrine would allow the employer to fire employee A and merely warn employee B. Absent a contract of employment or other legally cognizable claim, courts have no business interfering with employers' decisions to warn or fire at-will employees.

 We additionally conclude that Mount Vernon's perception that it had cause for terminating Grant does not alter the at-will relationship. Employers will almost always believe there is "good cause" for terminating an employee, including an at-will employee. The fact that an employer claims it takes no disciplinary action without a good reason does not mean the employer can only act in the presence of a good reason. This court reached a similar result in *Davis v. Orangeburg–Calhoun Law Enforcement Com'n*, 344 S.C. 240, 542 S.E.2d 755 (Ct.App.2001). Davis claimed an employment contract was created when his employer told him "he could 'only be terminated for cause.'" *Id.* at 249, 542 S.E.2d at 760. We held such a statement "insufficient by itself to provide a factual issue as to alteration of Davis's at-will employment status." *Id.* (citing with approval *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex.1998) (statements that an employee will be discharged only for "good reason" or "good cause" do not form a binding contract "when there is no agreement on what those terms encompass. Without such agreement the employee cannot reasonably expect to limit the employer's right to terminate him.")).

## IV.

We find Mount Vernon's termination policy did not apply to Grant as a salaried employee, and for the reasons discussed above, we hold that an at-will employment relationship existed between Grant and Mount Vernon. We join the circuit court in concluding that Mount Vernon was entitled to summary judgment.

**AFFIRMED.**

SHORT and WILLIAMS, JJ., concur.