# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

William Crenshaw, Respondent,

v.

Erskine College and David A. Norman, Petitioners.

Appellate Case No. 2018-001926

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Abbeville County
Eugene C. Griffith Jr., Circuit Court Judge

---

Opinion No. 27993
Heard January 15, 2020 – Filed September 9, 2020

---

## REVERSED

---

Thomas H. Keim Jr., Ford & Harrison, LLP, of
Spartanburg, for Petitioners.

E. Charles Grose Jr., Grose Law Firm; Robert J. Tinsley
Sr., and Robert Jamison Tinsley Jr., Tinsley & Tinsley,
P.C., all of Greenwood, for Respondent.

---

**JUSTICE FEW:** William Crenshaw—a tenured professor of English at Erskine College—brought this lawsuit claiming he was wrongfully fired. An Abbeville County jury found in favor of Dr. Crenshaw and awarded him $600,000. We hold the trial court properly granted Erskine's motion for judgment notwithstanding the

verdict (JNOV) because—as a matter of law—Erskine did not breach its contract with Dr. Crenshaw.

## I.      Facts and Procedural History

William Crenshaw, Ph.D. began teaching at Erskine College in Due West, South Carolina, in 1976.  Erskine granted him tenure in 1984.  On the morning of Friday, September 24, 2010, Dr. Crenshaw was teaching a freshman seminar on critical thinking skills.  He noticed one of the students was "nodding off . . . like she was going to sleep."  The other students in the class told Crenshaw the student fell during lacrosse practice earlier that morning and hit her head on both her lacrosse stick and the ground.  Crenshaw—a former paramedic—administered what he called "the standard orientation test" EMS personnel give for "a suspected head injury."  Crenshaw determined the student needed medical attention, so he stepped out of the classroom and called Robyn Agnew—Vice President for Student Services—to arrange for an ambulance.  When EMS arrived, paramedics removed the student from the classroom and put her into the ambulance.

When the class ended, Crenshaw noticed EMS was still on campus.  He decided to approach the ambulance to "see how she's doing."  The paramedics informed Crenshaw that the athletic trainers and the student's guardian told the student she could refuse to be transported in the ambulance.  Crenshaw testified the student was upset and the paramedics requested his help to calm the student.  Crenshaw then entered the ambulance where he discussed with the student whether she should refuse to be taken to the hospital.  Later that day, the guardian informed the Academic Office she intended to file a complaint against Crenshaw claiming Crenshaw pushed her out of the way as he entered the ambulance.  The Due West Police Chief, who responded to the scene "in reference to an assault," testified the guardian "was very irate" and "we had to calm her down."  He testified Crenshaw's "behavior was normal" and he did not "do anything out of line."

Over the weekend, Crenshaw and Adam Weyer—Erskine's head athletic trainer—engaged in a heated email exchange.  Weyer accused Crenshaw of violating an Erskine student athlete "protocol" that directs faculty members to call athletic trainers before calling for EMS.  Crenshaw responded that Erskine's "'normal protocol,' as you call it, is certainly different from the nationwide emergency medical protocols for blunt closed head trauma.  Why is that?"  Crenshaw also wrote, "The fact that you or your people were attempting to stop emergency transport when definitive diagnosis is beyond your capability is chilling, dangerous, and a lawsuit waiting to happen."  Finally, Crenshaw wrote, "When you endanger students, you

bet I'm going to question the way you do your job."  In these emails, Crenshaw repeatedly asked for a copy of the protocol Weyer said he violated, but apparently was never given one.

The next week, three Erskine officials filed grievances against Crenshaw for his conduct on September 24 and over the weekend.  The procedure for handling grievances of this sort is set forth in "The College Faculty Manual."  The August 31, 2009 version of the Faculty Manual comprises sixty-five pages and an appendix of forms addressing a wide variety of subjects affecting faculty, other employees, and students.  The section entitled "Faculty Committees" provides for grievances to be forwarded to the Grievance Committee, a "standing" committee consisting of six faculty members who hold no administrative position.  The Faculty Manual[1] provides the committee will "act as a mediator," and "determine whether basic rights, such as academic freedom, have been respected."  The committee met, but the chairman reported they were unable to assist in resolving the dispute.

After an effort to mediate the grievances by a dean was unsuccessful because the Erskine officials who filed them refused to participate, Dr. David Norman— President of Erskine College—appointed professors to an ad hoc faculty committee—as provided for in the Faculty Manual—to interview those involved and advise him "regarding the nature and extent of relevant culpability."  Crenshaw met with this committee in December, and categorically denied all allegations against him.  He questioned the committee's procedures and accused the members of "ad hoc justice, justice on the fly."  When the members asked a question about a specific allegation, Crenshaw responded by asking for evidence to support the allegation.  He accused the committee of going on "fishing expeditions" and violating his "due process."

He also told the committee, "You people are putting yourselves in harm's way," and "you are [about] to put yourselves in jeopardy."  Several members of the ad hoc committee interpreted Crenshaw's comments as threatening.  One of the members

---

[1] The document entitled "The College Faculty Manual" is the central document of this litigation.  We will discuss it extensively in this opinion.  Crenshaw contends it is his written contract.  Erskine relies on its terms in defending Crenshaw's allegation of a breach of contract.  Norman and Crenshaw, however, sometimes referred to it as the "handbook."  For brevity, we will refer to it as the Faculty Manual.  For clarity, there is only one document that anyone contends contains the terms of Crenshaw's contract, and it is the Faculty Manual.

recused himself because he felt threatened.  In a letter to President Norman the same day as the committee meeting, the professor wrote,

> I am very much a proponent of faculty self-governance and defending faculty rights, but the environment is so toxic, with pervasive bullying on the part of Dr. Crenshaw that I must recuse myself.  I feel that I can no longer serve as a fair and impartial member of this committee due to . . . the constant aggressive acts . . . and threats of Dr. Crenshaw . . . at this meeting today . . . ."

In early January 2011, the committee made its report to President Norman.  The professor who wrote that he was recusing himself nevertheless signed the report, which said nothing about any threatening behavior.  In concluding the report, the committee wrote, "At this time we believe that we can do no more to help resolve this situation.  It is our opinion that faculty governance will not be successful in this case."

Erskine took no further action until August 2011.  During the interval, many alumni publicly called for Erskine to split with the Associate Reformed Presbyterian Church.  On one of the Facebook pages on which alumni wrote in favor of the split, Crenshaw posted the following,

> I think this [Facebook page] does accomplish three things.  First it spreads the word and the outrage.  This [page] is a means to an end.  The end[s] are the other two accomplishments: second, people are encouraged to quit donating to Erskine and to quit sending their kids until all this is straightened up.  The power of the purse is far more significant and successful than any behind the scenes deal-cutting has been.  And third, this [page] shines the light on the actions of Synod, wingnuts, and the admin; i.e., it delivers a healthy wallop of bad publicity to Erskine, which means they have to spend time countering the bad publicity and answering for what they are doing.  I would submit that if there is behind the scenes pressure being put on the admin or the wingnuts, it has come from the sense of outrage generated by this site that led to private, chew-

them-out phone calls, not something achieved by following Marquis of Queensbury[2] niceties.

On August 6, 2011, President Norman met privately with Crenshaw to attempt to resolve the dispute. Both men made audio recordings of the meeting. President Norman began the meeting by reading a letter stating Erskine was beginning termination proceedings because of the way Crenshaw treated his colleagues in the aftermath of the ambulance incident. Norman informed Crenshaw he was suspended, and thus would not be teaching in the fall semester. Norman outlined the steps Crenshaw must take to keep his job. First, Crenshaw must apologize to the officials who filed grievances against him. Second, he must apologize to the faculty for his abrasive behavior towards the ad hoc committee. Third, he must apologize to the Erskine Community—"the people that read your [Facebook posts], that sort of thing"—for disparaging the institution. Crenshaw was contentious through much of the meeting, telling Norman at one point, "Oh, come on. You're a son of a bitch. . . . You're a nice son of a bitch, but you're still a son of a bitch."

Crenshaw brought up the possibility of taking an early retirement, and the two discussed the terms of a potential retirement agreement. On August 8, Crenshaw emailed Norman indicating he and his attorney were "willing to discuss" early retirement. Norman replied by sending Crenshaw a draft retirement announcement and retirement agreement which provided twenty-one days for Crenshaw to consider the retirement option.

On August 12, Norman sent Crenshaw an email with an attached letter. In the email, Norman assured Crenshaw the early retirement offer "still stands." In the letter,

---

[2] Crenshaw was referring to rules governing the sport of boxing, designed to bring order and civility to the brutal sport. *See Marquess of Queensbury Rules*, ENCYCLOPAEDIA BRITANNICA, https://www.britannica.com/sports/Marquess-of-Queensberry-rules (last visited September 8, 2020). The Supreme Court of the United States referred to these rules in *Miranda v. Arizona*. Giving examples of contrasting commentary by law enforcement officers on the Court's then-recent decision in *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964), the Court quoted the former Police Commissioner of New York as stating, "What the Court is doing is akin to requiring one boxer to fight by Marquis of Queensbury rules while permitting the other to butt, gouge and bite." *Miranda*, 384 U.S. 436, 442 n.3, 86 S. Ct. 1602, 1611 n.3, 16 L. Ed. 2d 694, 705 n.3 (1966) (citing N.Y. Times, May 14, 1965, p. 39).

Norman outlined three categories of allegations. The first category included Crenshaw's climbing into the ambulance, his pushing of the student's guardian, and his medical advice to the student when others with more authority were present. Norman labeled this behavior "rude" and said it was beyond Crenshaw's authority to attempt to overrule the student's guardian and EMS personnel. The second category involved Crenshaw's behavior during the grievance process. Norman labeled this behavior as "bullying" and "contempt[uous]" and said it "evidence[d] a pattern" of "volatility" that "has created a hostile working environment on the Erskine campus." The third category concerned the Facebook post encouraging readers to stop donating to Erskine and sending their children there. Norman labeled this behavior as "blatant disloyalty to Erskine College." He wrote that he found "probable cause to believe [Crenshaw] engaged in culpable conduct" warranting termination. Norman referenced several provisions of the Faculty Manual, including,

> You have a right under College policy to a full hearing before a faculty committee. Unless you waive your right to a hearing, it shall be held on August 29th at 9 AM . . . in the Chestnut Room. This schedule is subject to adjustment upon reasonable request. As also stated in the handbook, you will reply to this letter in writing, stating whether this hearing is desired. This reply shall not be less than two weeks before the date set for the hearing.

Norman ended the letter stating "my decision is to seek your termination."

Crenshaw did not respond to this letter. On August 29, Norman sat in the Chestnut Room from 9 a.m. until noon. Crenshaw did not appear.

The twenty-one day period to consider early retirement expired on August 30. The next day, Norman emailed Crenshaw's attorney and extended the deadline to accept early retirement until September 5. Norman wrote, "As we discussed today, if Dr. Crenshaw is unable to fully accept an agreement by next Tuesday (September 5th), I will send an updated version of the . . . termination letter." Neither Crenshaw nor his attorney responded.

On September 7, 2011, Norman wrote Crenshaw informing him, "In view of your failure to make a timely demand for a hearing before the faculty committee in accordance with my letter to you dated August 12, 2011, and the College Faculty Manual, your employment is terminated at the end of the day today."

On July 22, 2014, Crenshaw filed this lawsuit against Erskine College and David Norman in his individual capacity. Crenshaw included a cause of action for what he called "wrongful discharge,"[3] along with causes of action for breach of contract and intentional infliction of emotional distress. The trial court dismissed all claims except breach of contract against Erskine. The jury awarded Crenshaw $600,000 in damages. The trial court granted Erskine's motion for JNOV. The court of appeals reversed and reinstated the jury verdict. *Crenshaw v. Erskine Coll.*, 424 S.C. 287, 297, 818 S.E.2d 218, 224 (Ct. App. 2018).

## II.    Analysis

Most participants in this case—including the dissent, but not including the trial court in its ruling granting JNOV—have overstated the significance of "tenure" to Crenshaw's enforceable rights in this breach of contract case.

### A.    Tenure

The word "tenure" as it is used in the academic setting is a short-form expression of an elaborate theory. In simple terms, when an academic institution grants tenure to one of its professors, the institution promises long-term job security to the professor that differs from the employment-at-will status of non-tenured faculty. In more complicated terms, academic institutions developed the theory of tenure to serve important purposes, for the benefit of the professor and the institution, but also for the benefit of society.

> Tenure is a means to certain ends; specifically: (1) freedom of teaching and research and of extramural activities, and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society.

---

[3] The trial court later dismissed this claim—correctly—on the ground that a claim for wrongful discharge does not exist in the abstract, but instead must be based on a contract, a constitutional provision, public policy, or some other identifiable provision of law. In this case, as we will explain, Crenshaw's only claim for wrongful discharge is his breach of contract claim.

*Statement of Principles on Academic Freedom and Tenure*, American Association of University Professors (1940). The use of tenure for the pursuit of these ends for over 100 years[4] has led to an extensive body of recorded thought on the theory of tenure and what it means to professors, institutions, and the rest of us. *See generally Mayberry v. Dees*, 663 F.2d 502, 513-19 (4th Cir. 1981) (the Fourth Circuit provides "a rather detailed description of the tenure concept"); Symposium, *Freedom and Tenure in the Academy: The Fiftieth Anniversary of the 1940 Statement of Principles*, 53 Law & Contemp. Probs., no. 3 (William W. Van Alstyne, ed., 1990) (collecting ten essays, an extensive bibliography, and the text of the 1915 "General Report" and 1940 "Statement" of the American Association of University Professors, *supra*).

In academia, the meaning of the word "tenure" as it relates to a professor's enforceable job security is described in deceptively simple terms, even if every academic does not agree on precisely how it should be simply stated. In a 1971 Symposium on the subject, a former President of Yale University wrote, "The practical fact in most places . . . is that tenure is for all normal purposes a guarantee of appointment until retirement age." Kingman Brewster Jr., *On Tenure*, 57 AAUP Bull. 381, 381 (1971). In a different article in the same Symposium—in apparent disagreement—a longtime Duke University Law School professor wrote, "Tenure, accurately and unequivocally defined, lays no claim whatever to a guarantee of lifetime employment. Rather, tenure provides only that no person continuously retained as a full-time faculty member beyond a specified lengthy period of probationary service may thereafter be dismissed *without adequate cause*." William W. Van Alstyne, *Tenure: A Summary, Explanation, and "Defense,"* 57 AAUP Bull. 328, 328 (1971) (emphasis in original).

In law, however, the word "tenure"—by itself—is of little help in understanding the rights a tenured professor may enforce in court. When government-supported institutions grant tenure, the tenured professor's enforceable rights derive primarily from the Due Process Clause of the Fourteenth Amendment, *see, e.g.*, *Ross v. Med. Univ. of S.C.*, 328 S.C. 51, 66, 492 S.E.2d 62, 70 (1997) ("A tenured professor has a property interest in continued employment which is safeguarded by due process." (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548, 560 (1972))), and from the Free Speech Clause of the First

---

[4] *See General Report of the Committee on Academic Freedom and Academic Tenure*, American Association of University Professors (1915).

Amendment, *see, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697, 33 L. Ed. 2d 570, 577 (1972) (recognizing the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech"). The theory of tenure and the "ends" it serves—such as academic freedom and freedom of speech—informs the body of constitutional law defining legally enforceable rights for publicly employed tenured professors. *See, e.g.*, *Ross*, 328 S.C. at 66-67, 492 S.E.2d at 70-71 (recognizing the Due Process Clause dictates the nature of pre-termination hearing a tenured professor is entitled to receive at a public institution).

The concept of adequate process, and the goals of academic freedom and free speech, likewise inform the development of tenure policies at private institutions. Erskine designed the sections of its Faculty Manual dealing with tenure and termination of tenured professors with the clear intention of ensuring adequate process to, and promoting academic freedom and free speech for, its tenured professors. By promoting those goals, Erskine likewise promoted its own academic and religious mission.

The Faculty Manual sets forth Erskine's conception of academic freedom and free speech in a section entitled "Academic Freedom, Rank, Tenure, Appointment Renewal and Related Procedural Standards." The section begins,

> An Erskine professor is a teacher in a particular educational institution, a member of a learned profession, and a citizen, with responsibilities related to each of these roles. For the fulfillment of these responsibilities a climate of academic freedom is necessary, not merely for the good of the faculty member or of the institution, but also for the common good.

The section goes on to explain in some detail what "Academic freedom means . . ." to Erskine and what "Academic freedom requires . . ." of its professors. The section stresses "a professor has the right to advocate solutions to human problems and to seek to influence human affairs," and a professor's role as a citizen carries "the responsibility to take stands on public issues which affect life in the larger community." But the section also requires professors "to perform in consonance with the purposes of the College as adopted by the Board of Trustees," and "to support the College Mission Statement and to contribute to our mission." Finally, the section provides, "If an Erskine College professor behaves in a manner that is

not consistent with our Mission Statement he/she may be subject to disciplinary action up to and including dismissal."

Thus, adequate process, academic freedom, and free speech informed Erskine's development of the contractual rights it promised a tenured professor in the Faculty Manual. When private institutions grant tenure, however, the Constitution provides the tenured professor no additional protections from the actions of the institution beyond those set forth in the professor's contract. As the Supreme Court of the United States has stated, "it is fundamental that the First Amendment prohibits *governmental* infringement on the right of free speech. Similarly, the Fourteenth Amendment . . . applies to acts of the states, not to acts of private persons or entities." *Rendell-Baker v. Kohn*, 457 U.S. 830, 837, 102 S. Ct. 2764, 2769, 73 L. Ed. 2d 418, 425 (1982) (emphasis added); *see also Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S. Ct. 454, 461, 102 L. Ed. 2d 469, 484 (1988) ("Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be."); *Branham v. Thomas M. Cooley Law Sch.*, 689 F.3d 558, 562 (6th Cir. 2012) (finding "the tenure held by [a professor at a private institution] does not afford her rights beyond those enumerated in her contract"); J Royce Fichtner & Lou Ann Simpson, *Trimming the Deadwood: Removing Tenured Faculty for Cause*, 41 J.C. & U.L. 25, 28 (2015) ("Tenure can also have a very different meaning in private, as opposed to public, institutions. Tenured faculty in public institutions have a 'property interest' in continued employment via state statutes and the Fourteenth Amendment, but faculty in private institutions may only have a contractual interest in continued employment.").

The status of "tenured" is important to the rights of any professor. Without it, the professor is probably an employee at will. The theory of "tenure" is important to the development of the constitutional and contractual rights that come with the status of "tenured." Once a professor is tenured, however, the rights the professor may enforce in court are not directly affected by the meaning of "tenure." At a public institution, a tenured professor may enforce her or his constitutional rights under the Due Process and Free Speech Clauses. At a private institution, a tenured professor has no right of legal recovery for violations of due process or free speech. While the concepts of due process, academic freedom, and free speech are critical to the development of a private institution's tenure policies, at a private institution, those concepts do not define a tenured professor's enforceable rights. Only the written terms of the professor's contract do that.

Erskine College is a private institution. This case, therefore, is not about tenure. This case is not about whether Erskine denied Crenshaw due process, academic freedom, or free speech. This case is not about whether Crenshaw was correct the student should be taken to the hospital for evaluation, or whether Erskine's alleged "protocol" was medically unsound and Crenshaw was justified in criticizing it. This case is not about whether Crenshaw should be free to publicly criticize Erskine, or publicly argue it should split from the church. Rather, this is an ordinary breach of contract case in which the terms of the contract are set forth in The College Faculty Manual.

We proceed, therefore, to explain that the trial court correctly ruled as a matter of law that Erskine did not breach Crenshaw's contract.

### B. The Contract

Crenshaw contends Erskine violated the provisions of the Faculty Manual entitled "Termination of Tenured Faculty Appointments." He alleged in his complaint, "The relationship thus became an ongoing contract between [Crenshaw] and . . . Erskine College governed by The College Faculty Handbook."[5] Erskine refused at trial to concede the Faculty Manual is a contract, and continued its refusal to concede the point until we forced it to do so at oral argument before this Court. We hold Erskine's Faculty Manual is a contract with its tenured professors as a matter of law.

Tenure—by its very nature—is a promise. President Brewster of Yale described it as a "guarantee," Brewster, *supra*, at 381, and Professor Van Alstyne of Duke said it means "no person continuously retained as a full-time faculty member . . . may thereafter be dismissed without adequate cause," Van Alstyne, *supra*, at 328. Erskine wrote the sections of the Faculty Manual relating to tenure for the stated purpose of providing rights and procedures to tenured faculty. In exchange, as also stated in the Faculty Manual, Erskine designed its tenure program to retain faculty on a long-term basis and promote its academic and religious mission. Erskine's granting of tenure to Crenshaw in 1984 was an offer to fulfill the promises set forth in the Faculty Manual. Crenshaw accepted Erskine's offer by his continued performance as a tenured professor. *See Small v. Springs Indus., Inc.*, 292 S.C. 481, 484, 357 S.E.2d 452, 454 (1987) (where an employer "made an offer or promise . . . in return for specified benefits," and the employee "accepted this offer by performing

---

[5] There is not a "Faculty Handbook." The reference is to the Faculty Manual. *See supra* note 1.

the act on which the promise was . . . based," the "promise constituted the terms of the employment agreement" based on "sufficient consideration to make the promise legally binding"); *Hessenthaler v. Tri-Cty. Sister Help, Inc.*, 365 S.C. 101, 108, 616 S.E.2d 694, 697 (2005) (stating "a 'court should intervene to resolve the handbook issue as a matter of law . . . if the handbook statements and the disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise . . . does . . . exist'" (quoting *Fleming v. Borden, Inc.*, 316 S.C. 452, 464, 450 S.E.2d 589, 596 (1994))); *see also* 19 WILLISTON ON CONTRACTS § 54:10 (4th ed. 2016) ("If the intention of the parties can be ascertained from the terms of the personnel manual alone, its interpretation is a matter of law for the court.").

We have required that courts be reluctant to find an employee handbook or manual to be a contract as a matter of law when the purported contract document contains a disclaimer provision. "In most instances," as we stated in *Hessenthaler*, "judgment as a matter of law is inappropriate when a handbook contains . . . a disclaimer . . . ." 365 S.C. at 108, 616 S.E.2d at 697; *see also Small*, 292 S.C. at 485, 357 S.E.2d at 455 (explaining an employer might avoid being bound in contract by provisions of a policy manual "merely by inserting a conspicuous disclaimer"). In this case, the Faculty Manual states conspicuously at the bottom of almost every page, "This is not a contract of employment." For non-tenured faculty, non-faculty employees, and members of the Board, even students—to each of whom the Faculty Manual has some application—this disclaimer provision may require the question of whether a contract exists to be submitted to the jury. Also, the Faculty Manual—as we will discuss below—contains a section describing Erskine's relationship with the Associate Reformed Presbyterian Church. The disclaimer provision could play an important role in determining whether the Faculty Manual is a contract between Erskine and the church.

The promises inherent in the granting of tenure, however, render the situation entirely different when it comes to the enforceable contractual rights of tenured faculty. The "extensive body of recorded thought" on tenure referred to above leaves no doubt that institutions of higher learning purposefully induce professors to rely on the promises of tenure, that professors do in fact rely on the promises, and tenured professors continue to teach at the institution on the condition of the fulfilment of such promises, all of which is "indispensable to the success of an institution in fulfilling its obligations to its students and to society." *Statement of Principles on Academic Freedom and Tenure*, *supra*. The role of the granting of tenure in our analysis of whether the Faculty Manual is a contract with tenured faculty probably renders this analysis inapplicable in any other context. In the context of this case—

analyzing the enforceable rights of tenured professors at private institutions[6]—the promise of tenure leaves us with no doubt that the Faculty Manual is a contract. *See* Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers*, 13 Indus. Rel. L.J. 326, 377 (1992) ("The court should . . . decide [such questions] as a matter of law [when] . . . the handbook statements are so detailed or unequivocal that, even with a disclaimer, they could not plausibly be interpreted in a non-promissory manner.").[7]

The Faculty Manual provides, "Except for retirement, resignation, or disability, the services of a faculty member with tenure are to be terminated only for adequate cause . . . ." The "Termination of Tenured Faculty Appointments" section defines "adequate cause" to include "personal conduct which substantially impairs the individual's fulfillment of institutional responsibilities" or which "violates the moral standards which have always been a part of the Erskine College community." The section also provides,

> Erskine College is a private, Christian Liberal Arts Institution. Every faculty member is required to support the College Mission Statement and to contribute to our mission to provide "an excellent liberal arts education in a Christ-centered environment." Any professor . . . who behaves in a manner that is not consistent with our Mission Statement may be subject to disciplinary action up to and including dismissal.

The Faculty Manual then sets forth the steps Erskine must follow for terminating a tenured faculty member. The Faculty Manual recites Erskine's purpose in drafting

---

[6] A contract analysis is likely unnecessary for professors at public institutions, as "A tenured professor has a property interest in continued employment which is safeguarded by due process." *Ross*, 328 S.C. at 66, 492 S.E.2d at 70. The enforceable rights of a tenured professor at a public institution are more likely to be litigated on claims for due process and free speech violations than under contract.

[7] In *Fleming* in 1994—following up on our 1987 holding in *Small*—we relied heavily on this law review article. *See Fleming*, 316 S.C. at 461, 461, 462, 450 S.E.2d at 594, 595, 596 (citing and quoting Befort, *supra*, at 377). The Industrial Relations Law Journal is now the Berkeley Journal of Employment and Labor Law maintained at the University of California, Berkeley.

the procedures to ensure "that both individual rights and its own institutional integrity are preserved through procedures that guarantee due process."

The first step, called "Preliminary Proceedings," provides the president must "seek to resolve the matter with the tenured faculty member in private."  The second step, called "Formal Proceedings," provides,

> The President will inform the tenured faculty member in writing of the dismissal and the grounds for it.  The President will also advise the tenured faculty member of the right to a hearing before a faculty committee and will indicate the time and place of the hearing.  In fixing the time and place of the hearing, the President will allow sufficient time for the tenured faculty member to prepare a defense.  The President will inform the tenured faculty member of the procedural standards set forth here.
>
> The tenured faculty member will reply in writing to the President stating whether a hearing is desired, and the reply shall be not less than two weeks before the date set for the hearing.

The third step is called "Hearing Committee."  The section describing this step provides the faculty will elect seven of its members "not previously concerned with the case."  The Faculty Manual states this committee has broad authority to determine the order of witnesses and the admissibility of evidence.  The committee, the President, and the tenured faculty member may be represented by counsel.  The President is given "ample opportunity to argue the case" and the tenured faculty member "will be afforded ample opportunity for defense and for questioning witnesses."  The Faculty Manual requires, "A verbatim record of the hearing will be kept and typewritten copies will be made available" to the President, the professor, and if necessary, the Board.  "The burden of proof will be on the administration."  The Hearing Committee has the power to uphold the President's decision, or to reverse it.

The fourth step is called "Appeals," and provides, "Either the President or the tenured faculty member may appeal the decision of the hearing committee directly to the Board of Trustees."  The Faculty Manual provides the final decision belongs to the Board, whose "review will be based on the record of the Committee hearing."

The Faculty Manual states the Board "will provide opportunity for argument, oral or written, or both."

###        C.        Breach of Contract

Crenshaw makes numerous arguments that Erskine failed to comply with the Faculty Manual, and thus breached his contract. We address each in turn.

First, Crenshaw argues Erskine did not have adequate cause to terminate him. His counsel set this argument out in detail in his closing argument for the jury. He argued Crenshaw "did the right thing" and "acted properly" in calling the ambulance and encouraging the student to go to the hospital; Crenshaw "wasn't even subject to that protocol"; and even if he was, "he did not violate any Erskine College protocol." Counsel cited evidence that refuted the guardian's claim Crenshaw pushed her. He said the three grievances had "no substance . . . [or] truth behind them," and in any event, the grievances were never decided, and thus not a proper basis for adequate cause. He argued Erskine never seriously engaged in mediation—as required by the Faculty Manual—and President Norman elevated minor incidents into "his own categories" of allegations that were unjustified in light of what actually happened. He argued Crenshaw's behavior at the ad hoc committee meeting was not improper, stressing Crenshaw was justifiably "fighting for proper process and procedure" in faculty governance. He then refuted the claim of disloyalty in the Facebook post by reciting extensive evidence of Crenshaw's many acts of loyal service to Erskine, to the community of Due West, and to Abbeville County for thirty-five years.

This argument—a good argument on the facts—fails as a matter of law. Under the clear terms of The College Faculty Manual—Crenshaw's contract—the decision to fire a tenured professor for cause belongs only to the Board of Trustees. Under the Faculty Manual, Norman's decision to "seek . . . termination" through formal proceedings was a preliminary decision. Norman's decision was reviewable by the Hearing Committee, which had full power to overrule Norman. The Hearing Committee's decision, in turn, was reviewable by the Board. The Board had the ultimate authority to overrule or affirm the Hearing Committee. Under the terms of the Faculty Manual, the Board—not Norman—has exclusive authority to determine whether adequate cause exists for termination of a tenured professor, and even if so, whether to terminate.

There are several ways of looking at this point of law. One, under the terms of Crenshaw's contract with Erskine, Norman did not fire Crenshaw. He simply set in motion the contractually mandated "Formal Proceedings" process that could

eventually result in Crenshaw's firing. Crenshaw elected not to seek review of Norman's decision to initiate those proceedings. This way of looking at the point is akin to a person failing to exhaust administrative remedies. More accurately here, however, Crenshaw failed to pursue his only contractual remedy, which was to take the question to the Board, and if the Board's decision were adverse, challenge *that* decision in court. Two—similarly—Crenshaw's contract sets forth the remedies he may enforce. Because his contract permits the Hearing Committee to overrule the President, and the Board to overrule the Hearing Committee, the President's decision is not actionable. Crenshaw's contractual remedy is only to challenge a final decision, which—under the terms of the contract—must be the decision of the Board.[8] Three, Erskine embraced the ideal of faculty governance as part of the theory of tenure. The Board framed Erskine's governance structure to remove the administration from several levels of the process provided to tenured professors, including the Hearing Committee step. The Hearing Committee is one of several manifestations of the idea of faculty governance in the Faculty Manual. Crenshaw's opportunity to appeal President Norman's action to the Hearing Committee was not merely a contractual burden the Board imposed upon Crenshaw. Rather, the Board included the Hearing Committee step to protect Crenshaw and other tenured professors from the very conduct Crenshaw alleges Norman undertook to improperly terminate him. This governance decision also gave the faculty structured input to the Board in the event of an appeal. Crenshaw failed to avail for himself the Board's decision to give faculty governance precedence over Norman's administrative authority. Four, all organizations—public, private, corporate, academic—define their own governance structure in accordance with the law. Under Erskine's governance structure, the Board of Trustees controls the College. The Board could have chosen to give the President the authority to fire a tenured professor. It chose not to do that. The Board retained for itself the sole authority to fire a tenured

---

[8] The dissent cites several cases holding a private institution may not enforce a contractual provision that purports to prevent a fired professor from challenging the termination in court. *See McConnell v. Howard Univ.*, 818 F.2d 58, 68 n.11 (D.C. Cir. 1987); *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 862-63 (7th Cir. 2016). As there is no such provision in the Erskine Faculty Manual, we do not understand the dissent's point. We certainly agree the Due Process Clause permits Crenshaw to file this lawsuit. As to *McConnell*, the dissent includes an extensive discussion of footnote 11. For an accurate understanding of that footnote, however, we note the D.C. Circuit's apparent intent that "footnote 11 is informational only." *McConnell*, 818 F.2d at 71 (Buckley, J., concurring).

professor.  When Crenshaw elected not to take Norman's action to the Board for review, he elected not to remain employed at Erskine College.

The dissent states we "grievously err" by "invading the province of the jury" on this point, and accuses us of a "stunning departure from our jurisprudence." Respectfully, we suggest it is the dissent that departs from standard principles of contract law.  Actions on a contract must be based on the terms of the contract. *Maybank v. BB&T Corp.*, 416 S.C. 541, 573, 787 S.E.2d 498, 515 (2016).  "The court's duty is to enforce the contract made by the parties regardless of its wisdom or folly . . . ."  *Ellis v. Taylor*, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994).  No jury—nor any judge—is permitted by law to rewrite a contract to impose liability based on some vague personal sense of what is fair.  The contract in this case is written—the Faculty Manual—and our decision is based on its written terms.

The dissent's analysis is not based on the written contract.  In numerous instances the dissent invents fanciful contract provisions, and makes such remarks as, "The jury may well have decided" this, or "the evidence presented could well have prompted the jury to conclude" that, or "the jury could have determined" another possibility.  In most such instances, the dissent speculates on a scenario Crenshaw's attorney did not argue to the jury.  In one particularly striking instance, the dissent hypothesizes the following scenario could be a breach of contract:

> [T]he College forwarded the grievance to the faculty grievance committee to resolve the matter without providing its members with any direction on how the committee was to accomplish its task, thus preventing the committee from formulating a workable mediation plan. In so doing, the jury likely took into account that Norman had assumed the presidency of Erskine in 2010 at a young age, and that by the time of trial, he had already left that position.[]  The jury could have found that this failure constituted a breach by Erskine of the provision in the handbook, which provides that the faculty grievance committee has the duty "to act as a mediator in cases where misunderstanding or unjust criticism may adversely affect either the professional reputation of a faculty member or the academic standing of the institution."  It is abundantly apparent from his actions in this case that Norman lacked the experience and institutional knowledge as to how to handle faculty grievances, but his failure to provide the

faculty grievance committee with any direction was inexcusable, and the jury may have found his conduct in mishandling the process breached Crenshaw's contract with the College.

The notion that a jury—or a Justice—may speculate so wildly as to a basis for imposing liability on a written contract is inconsistent with standard principles of contract law. The Faculty Manual requires nothing from the President in providing the faculty grievance committee "direction" on how to accomplish its work. To the contrary, the Faculty Manual espouses the ideal of "faculty governance." Faculty governance supersedes administrative authority, and precludes the administration from directing the work of faculty. The dissent's further suggestion that the jury could have found a breach of contract based on the jury's view of the appropriate age, experience, or institutional knowledge of Erskine's President is likewise inconsistent with standard principles of contract law.

The law provides—rather—that construing a contract is a question of law for the court. "[W]ritten contracts are to be construed by the Court" *unless* the "contract is ambiguous." *Cafe Assocs., Ltd. v. Gerngross*, 305 S.C. 6, 9, 406 S.E.2d 162, 164 (1991). The Faculty Manual provides that after the President has "inform[ed] the tenured faculty member in writing of the dismissal and the grounds for it" in the "Formal Proceedings" step, "The tenured faculty member will reply in writing to the President stating whether a hearing is desired" in the "Hearing Committee" step. To determine the meaning and legal effect of this provision, we must consider the entire Faculty Manual, including the power of both the Hearing Committee and the Board to overrule the President's decision. *See McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009) ("A contract is read as a whole document . . . ."). Viewed in this manner, the mandatory nature of the "reply in writing" provision is clear: the only method by which the professor may invoke the authority of the Board to make the final decision is to request a hearing before the "Hearing Committee," and if necessary, appeal to the Board. There is no other way to read the "reply in writing" provision. *See Hawkins v. Greenwood Dev. Corp.*, 328 S.C. 585, 592, 493 S.E.2d 875, 878 (Ct. App. 1997) ("A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (quoting 17A AM. JUR. 2D *Contracts* § 338, at 345 (1991))). There is no ambiguity. It is, therefore, the responsibility of the court—not the jury— to determine the legal effect of the "reply in writing" provision in the Faculty Manual.

Crenshaw's counsel argued several other points in his closing argument as to how Erskine breached the contract. First, counsel suggested Erskine denied Crenshaw's procedural rights in various respects. He argued to the jury,

> Based upon [] being a tenured professor, [Erskine] had the procedures they had to follow and they are not following them to the letter, not even the spirit, by jumbling the stages, they are still in the preliminary stage, negotiations and . . . then he immediately jumps into, well, here you are terminated. You have to request a hearing by the 15th.

Counsel concluded the argument, "Erskine violated his rights as a tenured professor . . . ; the procedural rights that they jumbled."

While Crenshaw did not argue to the jury Erskine denied him "due process," and Crenshaw makes only a passing reference to "due process" in the "Statement of Facts" section of his brief to this Court (no reference to it at all in the "Arguments" section), the dissent takes up the point for Crenshaw and argues Erskine denied Crenshaw his due process rights. We have already explained that Crenshaw—as a tenured professor at a private institution—has no constitutional due process rights. The dissent disagrees, but also argues "Erskine's Faculty Manual unequivocally grants him [contractual due process] rights." Before we address Crenshaw's argument that Erskine denied him the procedural rights specifically set forth in the Faculty Manual, we address the dissent's argument that Erskine granted Crenshaw "contractual" due process in the Faculty Manual.

Erskine stated in the Faculty Manual that its purpose in drafting the procedures set forth there was to "insure that both individual rights and its own institutional integrity are preserved through procedures that guarantee due process." The Faculty Manual also mentions—in a section dealing with non-tenured faculty—that "tenured faculty . . . have the right of due process concerning their employment status." As the Supreme Court of the United States has stated, "'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts." *Hannah v. Larche*, 363 U.S. 420, 442, 80 S. Ct. 1502, 1514, 4 L. Ed. 2d 1307, 1321 (1960). The general statements in the Faculty Manual referring to the general concept of due process do not grant Crenshaw enforceable rights to due process. A proper construction of a contract requires the court to give effect to specific terms over any general language. RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (1979); *see also State v. Sweat*, 386 S.C. 339, 347, 688 S.E.2d

569, 573 (2010) (reciting "the statutory construction rule that a court must follow a specific provision over general language"). The first subsection of the "Termination of Tenured Faculty Appointments" section is entitled "Procedures (Tenured faculty only)." Erskine prefaced the subsection stating its purpose is to "guarantee due process." The subsection then recites the specific procedures Erskine adopted to achieve that purpose. Erskine's promise was to follow the specific procedures, not to adopt the general concept of "due process." Crenshaw has no due process rights he may enforce against Erskine.

Other courts have reached the same conclusion regarding "contractual" due process rights. In *Jansen v. Emory University*, 440 F. Supp. 1060 (N.D. Ga. 1977), *aff'd*, 579 F.2d 45 (5th Cir. 1978), for example, a delinquent student at Emory University—a private institution—brought suit claiming Emory's refusal to graduate him from dental school violated a contractual provision stating "no student will be dismissed without due process." 440 F. Supp. at 1062. The district court ridiculed the idea that such a term in a contract with a private institution created a right to "contractual" due process.

> Over these bare bones the plaintiff attempts to drape the entire panoply of due process rights developed by the Supreme Court in cases [involving public universities]. Based on the assumption that the Emory contract meant to define "due process" in such a manner, the plaintiff argues that the process he received was deficient and thus constituted a breach. The underlying assumption is extravagant. It entirely disregards the fact that cases . . . involv[ing] the actions of tax-supported institutions . . . implicate fundamental consideration of the relationship between citizen and state which are quite distinct from that shared by students and private institutions. There is no basis for suggesting either that Emory, a private university, is subject to the restraints imposed on state institutions or that it meant to so bind itself by contract.

*Id.* The Fifth Circuit affirmed the district court in two sentences, noting "the district court's order is in complete accord with the recent pronouncement of the United States Supreme Court in *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978)." *Jansen v. Emory Univ.*, 579 F.2d 45, 45 (5th Cir. 1978); *see also Centre Coll. v. Trzop*, 127 S.W.3d 562, 567 (Ky. 2003) (stating "even when a private college specifically agrees to provide due

process, it does not necessarily subject itself to the entire panoply of due process requirements that would be applicable at a state-sponsored education institution").[9]

We now proceed to address the issue Crenshaw raises: whether there is any evidence in this case to support a finding that Erskine failed to follow the procedures promised to Crenshaw in the Faculty Manual. We find there is none. The first step—Preliminary Proceedings—Norman satisfied with his August 6 meeting. The second step—Formal Proceedings—Norman satisfied with his August 12 email and letter. The third step was the Hearing Committee, which the Faculty Manual required Crenshaw to request or it would not take place. Therefore, even if Erskine failed in the first or second step, Crenshaw's failure to avail himself of the third step extinguished his right to recover for breach of contract.

Crenshaw's next argument is that Erskine interfered with his early retirement offer by initiating Formal Proceedings for termination before the end of the twenty-one day period.[10] We find this argument fails as a matter of law. Crenshaw had no contractual right to early retirement. Rather, the early retirement offer was essentially a settlement offer Erskine made in an effort to avoid having to take the termination proceedings to a conclusion. Norman's initiation of formal termination proceedings before Crenshaw made a final decision on early retirement is not inconsistent with Crenshaw's contractual rights.

---

[9] The dissent argues *Jansen* and *Trzop* are not applicable because they involve students, and Crenshaw's case involves faculty. *See infra* note 18. The dissent misses that we cite *Jansen* and *Trzop* because they reject—as a matter of contract interpretation—the idea of "contractual" due process. Students and faculty are equally affected by the principles of contract interpretation. The dissent also misses a fundamental tenet of constitutional law. In addition to their contract analysis, *Jansen* and *Trzop* rely on the obvious point of constitutional law that the Due Process Clause limits only state action. The Due Process Clause places no limits on private action by private educational institutions such as Emory University, Centre College, or Erskine College. *See Tarkanian*, 488 U.S. at 191, 109 S. Ct. at 461, 102 L. Ed. 2d at 484 (distinguishing "state action" from "private conduct, against which the [Fourteenth] Amendment affords no shield, no matter how unfair").

[10] Federal law requires persons over the age of forty to be given twenty-one days to consider a retirement agreement. 29 C.F.R. § 1625.22(e)(1)(i) (2020).

Counsel also argued Norman "confused Dr. Crenshaw" by stating in the August 12 letter, "Unless you waive your right to a hearing, it shall be held on August 29 . . . ." Even if Norman's statement were unclear, it cannot change Erskine's obligations under the Faculty Manual. *See Player v. Chandler*, 299 S.C. 101, 104-05, 382 S.E.2d 891, 893 (1989) ("Any modification of written contract must satisfy all requisites of valid contract."); 299 S.C. at 105, 382 S.E.2d at 893 (adding "there must be a meeting of the minds between the parties with regard to all essential and material terms of the agreement"). Crenshaw's enforceable rights derive from the Faculty Manual, not from statements Norman made carrying out its procedures. In addition, Norman's statement is followed directly by a clear reference to Crenshaw's obligation—as stated in the Faculty Manual—to request a hearing in writing. Norman wrote, "As also stated in the handbook, you will reply to this letter in writing, stating whether this hearing is desired." The Faculty Manual clearly provides there will be a Hearing Committee proceeding only if the professor requests it in writing. The argument fails as a matter of law.

Crenshaw made other arguments in his briefs to the court of appeals and this Court. He argues Erskine violated the covenant of good faith and fair dealing that is implied in all contracts. *See Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995) ("There exists in every contract an implied covenant of good faith and fair dealing."). As an initial point on this argument, Crenshaw did not argue to the jury Erskine breached the implied covenant. The trial court did not explain the implied covenant in its jury charge. The first time Crenshaw made this argument was in his brief to the court of appeals.[11] The court of appeals relied on it in finding Erskine breached the contract. *See* 424 S.C. at 296, 818 S.E.2d at 223 (citing *Adams*). "However, there is no breach of an implied covenant of good faith where a party to a contract has done what provisions of the contract expressly gave him the right to do." *Adams*, 320 S.C. at 277, 465 S.E.2d at 85. As we explained, the "reply in writing" provision in the Faculty Manual required Crenshaw to request a hearing with the Hearing Committee. Erskine's reliance on this contractual provision cannot

[11] The court of appeals found Crenshaw did raise this issue at trial when his counsel said, "It shows a lack of good faith, the fact that they are jumbling these stages and give him two days to respond, or three, I guess, less than three days, weekend days." 424 S.C. at 298 n.4, 818 S.E.2d at 224 n.4. This statement was made during counsel's response to Erskine's motion for directed verdict, not during closing argument to the jury. Arguing a point of fact about good faith in response to a directed verdict motion is hardly sufficient to raise the implied covenant as a basis for the jury's finding of breach of contract.

be a breach of the implied covenant of good faith. The "covenant of good faith" argument fails as a matter of law.

Finally, Crenshaw argues Erskine breached his contract when Norman suspended him—with pay—in the August 6 meeting for the Fall 2011 semester. This argument fails as a matter of law. If Crenshaw had requested review of Norman's decision to seek termination, the suspension would necessarily have been subject to review. If the termination were reversed, so would be the suspension. If the termination were upheld, the suspension would be meaningless.

We now address two points regarding the court of appeals' opinion. First, the court of appeals considered whether Crenshaw breached the contract by failing to request a hearing before the Hearing Committee. 424 S.C. at 297, 818 S.E.2d at 224. The trial court submitted this question on its special verdict form to the jury, which answered, "No." The question is misplaced. Crenshaw had no contractual obligation to request a hearing such that his failure to do so is a breach of contract. The issues to be decided in Crenshaw's lawsuit are only the extent of Erskine's obligations under the contract, and whether Erskine breached the contract by failing to meet any of those obligations. The fact Crenshaw did not request a hearing before the Hearing Committee is not a breach of contract, but under the clear terms of the contract, it meant Erskine's obligation to conduct such a hearing never arose, and Norman's preliminary determination that adequate cause existed for termination became a final decision.

Second, the court of appeals stated, "By submitting the special verdict form to the jury, without objection, the parties agreed it was a question of fact as to whether the contract was breached." *Id.* The court cited no authority for the statement. The statement is an incorrect statement of the law of this State.

We conclude our analysis by addressing the dissent's argument minimizing the role of the Erskine College Board of Trustees. Erskine College was chartered in 1850, and currently exists as a nonprofit corporation under the South Carolina Nonprofit Corporation Act of 1994. *See* S.C. Code Ann. §§ 33-31-101 to -1708 (2006 & Supp. 2019). Subsection 33-31-801(a) of the Act (2006) requires, "Each [nonprofit] corporation must have a board of directors." Subsection 33-31-801(b) provides that except as the Board may delegate authority in the articles of incorporation, "all corporate powers must be exercised by or under the authority of and the affairs of the corporation managed under the direction of its board." Exercising those powers, the Erskine Board has directed the College to develop and execute its mission and

philosophy. The Faculty Manual recites two statements on its first page of text that frame the Board's vision for the College.

## Mission of Erskine College

The mission of Erskine College is to equip students to flourish by providing an excellent liberal arts education in a Christ-centered environment where learning and biblical truth are integrated to develop the whole person.[12]

## Purpose of Erskine College

Erskine College exists to provide opportunities for liberal arts education in an environment created from and expressive of Christian commitment. Striving for excellence and respecting individuality, the College seeks to enable each student to integrate knowledge and moral values in preparation for a life of service to God and society. Erskine, as part of the Associate Reformed Presbyterian tradition since 1839, attempts to unite faith and reason to produce an atmosphere in which Christianity undergirds the freedom of inquiry and inspires dedication to the search for truth and understanding.[13]

The next section of the Faculty Manual states Erskine's relationship to the church,

Erskine College represents the Associate Reformed Church in higher education. The relationship between the College and the Church is organic; that is, Erskine College is related to the General Synod of the Associate Reformed Presbyterian Church as the arm of the Church in Christian higher education in carrying out the Biblical mandate to

---

[12] The Faculty Manual indicates this "Mission Statement" was "Adopted by the Board of Trustees, October 2007."

[13] The Faculty Manual indicates this "Purpose" statement was "Adopted by the Faculty, Student Senate, and Board of Trustees, 1977-78, Reaffirmed, 1991."

redeem all of life, especially man's moral and intellectual life, under the authority and Lordship of Jesus Christ.

The Board undertook the design of its Faculty Manual within the context of the basic principles set forth in Erskine's mission and purpose statements, and its "organic" relationship with the church. This includes Erskine's own definition of the term "adequate cause" and its own conception of academic freedom. We find this to have been entirely proper, and important to a meaningful understanding of the enforceable rights of a tenured professor at a private, religious school like Erskine. Under Erskine's Faculty Manual, when the appeal of a tenured professor's termination reaches the Board, the Board has the detailed written description of allegations required to be prepared by the President, which gives the Board the administration's perspective, and the verbatim record of the proceedings of the Hearing Committee, which gives the Board the faculty's perspective. The Board's design of the Faculty Manual enabled the Board to consider the administration's perspective, the faculty's perspective, the shared perspective of its members, and to consider all of this in light of the principles set forth in its mission and purpose statements and Erskine's relationship with the church.

The Board's duty to protect Erskine's values overlaps almost completely with the Board's obligation to ensure Crenshaw was not fired without adequate cause. Erskine—having adopted the theory of tenure as part of its effort to develop academic freedom and free speech—had substantial reasons to promote those ideals, not to ignore or even underserve them. It was very much in the Board's interest to reverse Norman and reinstate Crenshaw if it believed the ideals of academic freedom and free speech were served by doing so. It was, however, the Board's decision.[14]

---

[14] Because Crenshaw's failure to request that the Hearing Committee review Norman's decision ends the case as a matter of law, we do not reach the degree of deference a court and jury must show the decision of the Board at a private, religious, educational institution before rendering a verdict to overturn the Board's decision and award damages. *See generally Fisher v. Shipyard Vill. Council of Co-Owners, Inc.*, 415 S.C. 256, 270, 781 S.E.2d 903, 910 (2016) ("Under the business judgment rule, a court will not review the business judgment of a corporate governing board when it acts within its authority and it acts without corrupt motives and in good faith." (quoting *Kuznik v. Bees Ferry Assocs.*, 342 S.C. 579, 599, 538 S.E.2d 15, 25 (Ct. App. 2000))).

### III. Conclusion

For the reasons explained, the trial court correctly determined as a matter of law that Erskine did not breach its contract with Dr. Crenshaw. We reverse the decision of the court of appeals to reverse the trial court's order granting JNOV.

**REVERSED.**

**KITTREDGE and JAMES, JJ., concur. HEARN, J., dissenting in a separate opinion in which BEATTY, C.J., concurs.**

**JUSTICE HEARN:**  This was a classic breach of contract case with myriad factual issues properly presented to and resolved by a jury.  The trial judge's decision to grant JNOV because Crenshaw failed to request a hearing following his termination by Erskine's president was error, and the court of appeals correctly reversed and reinstated the jury's verdict.  The majority's sweeping transformation of this quintessential jury issue into a matter of law represents a stunning departure from our jurisprudence; therefore, I dissent.

The majority's analysis fails because of three critical flaws.  First, it assumes the parties agreed the Faculty Manual created a contract between them.  To the contrary, Erskine steadfastly maintained that it did not, and consequently, this became an issue for the jury to determine.  Second, the majority, ignoring the proper role of an appellate court, appropriates the jury's function by defining the terms of that contract.  Finally, the majority interprets the provisions of the Faculty Manual and elevates a single term above all others—which again was an issue for the jury and not this Court—ultimately engrafting onto that provision the requirement that, if Crenshaw does not comply with it, he forfeits his due process right to seek redress in the courts.  In reaching its conclusion, the majority makes some unwarranted pronouncements about the concept of academic tenure.  Consequently, the majority not only nullifies the jury's verdict and strips Crenshaw of the benefits of tenure, but also effectively renders academic tenure meaningless in this state.

I begin with the familiar principle that a trial court's decision to set aside a jury verdict is a drastic remedy that should not be taken lightly. 49 C.J.S. *Judgments* § 83 (2009) ("[A] judgment notwithstanding the verdict is to be granted cautiously, and sparingly, and thus only when it clearly appears from the record that the party obtaining the verdict was not entitled thereto."); *id.* ("The standard employed should be in recognition that nullifying a jury verdict is a matter for the utmost judicial circumspection because the province of a jury is a pillar of the justice system."). Instead, "[t]he jury's verdict must be upheld unless no evidence reasonably supports the jury's findings." *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003). *See also Johnson v. Parker*, 279 S.C. 132, 135, 303 S.E.2d 95, 97 (1983) ("A jury verdict should be upheld when it is possible to do so and carry into effect the jury's clear intention."); 49 C.J.S. *Judgments* § 93 (2009) ("[W]here there is any credible evidence to support the jury's finding, the court is obligated to uphold it."). Instead of viewing the jury verdict through that lens and looking to the substantial evidence in the record which satisfies this minimal standard, the majority erroneously claims that all the evidence adduced in this case during the three-day trial points to one and only one conclusion—that Erskine did not breach its contract with Crenshaw.  Further encroaching upon the jury's province, the majority

determines as a matter of law that Crenshaw was not in fact terminated by President Norman because that authority rested solely with the Erskine Board of Trustees and posits instead that Norman's termination only became final when Crenshaw failed to request a hearing before the Board.[15]  While that may be one possible conclusion to be drawn from the contract of employment between Crenshaw and Erskine and the evidence presented at trial, it is certainly far from the only one.  More importantly, the jury—the body charged with determining whether a contract existed and the terms of that contract—clearly did not find Crenshaw's failure to pursue the appeals process to be controlling, nor does the Faculty Manual state that it is.

First, the existence of the contract and the terms of that contract were issues for the jury to determine, not this Court.  Erskine maintained throughout this litigation, including during the trial, that the Faculty Manual did not create a contract of employment.[16]  Given Erskine's continued insistence that the handbook did not constitute a contract, the trial judge had no alternative but to let the jury determine whether a contract existed.  Indeed, "[u]nder the common law, a trial court should submit to the jury the issue of [the] existence of a contract when its existence is questioned and the evidence is either conflicting or admits of more than one inference." *Small v. Springs Indus., Inc.*, 292 S.C. 481, 483, 357 S.E.2d 452, 454 (1987).  Here, the trial court correctly found there were genuine issues of material fact as to whether the Faculty Manual constituted a contract for tenured faculty such as Crenshaw and whether Erskine breached this contract.  Therefore, it properly denied Erskine's motions for summary judgment and directed verdict, which were based on the ground that the handbook did not create a contract.  If the trial judge had granted Erskine's motion for summary judgment or directed verdict in this case, it is blatantly obvious that this Court would have been required to reverse. *See*

---

[15] The notion that Crenshaw's termination by Norman was of no moment is in direct contravention to the evidence presented that Norman notified Crenshaw his employment was terminated by letter dated September 7, 2011, requested that he vacate his faculty office no later than 5:00 p.m. on September 16, and banned him from stepping foot on the Erskine campus—all clear indications that Norman's actions were indeed final.

[16] Alternatively, the College asserted that even if the Faculty Manual constituted a contract, Erskine followed it; likewise, this issue cannot be decided as a matter of law. *See Soil Remediation Co. v. Nu-Way Envtl., Inc.*, 325 S.C. 231, 234, 482 S.E.2d 554, 555 (1997) ("[W]here a contract is capable of more than one construction, the question of what the parties intended becomes one of fact to be submitted to the jury.").

*Conner v. City of Forest Acres*, 348 S.C. 454, 463, 560 S.E.2d 606, 610 (2002) ("Because an employee handbook may create a contract, the issue of the existence of an employment contract is proper for a jury when its existence is questioned and the evidence is either conflicting or admits of more than one inference.").

The majority concedes that tenure is a promise and claims the promises inherent in the granting of tenure make the Faculty Manual—as applied only to tenured faculty—a contract as a matter of law. While I appreciate the majority's effort to acknowledge the importance of tenure in academia, the fact that a college decides to include a tenure policy in its handbook does not necessarily transform it into a contract. *See Packer v. Trs. of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 852-53 (7th Cir. 2015) (affirming district court's holding that tenure policies in university's academic handbook did not create an enforceable contract); *Wilson v. Clark Atlanta Univ. Inc.*, 794 S.E.2d 422, 433 (Ga. Ct. App. 2016) (refusing to hold faculty handbook containing tenure policy constituted a contract). *But see Gray v. Loyola Univ. of Chicago*, 652 N.E.2d 1306, 1309 (Ill. Ct. App. 1995) (holding college's tenure obligations were not extinguished after merger with another university because faculty manual setting out terms and conditions of tenure created a contract). *See also* Ralph D. Mawdsley, *Litigation Involving Higher Education Employee and Student Handbooks*, 109 Ed. L. Rep. 1031, 1034-35 (1996) ("Whether employee handbooks are part of employee contracts will vary among states. Some states include handbooks as part of employment contracts. Other states require that a handbook be expressly included by reference into a contract before terms in the handbook are enforceable. On the other hand, other states require inclusion of handbook terms into an employment contract, even without express reference, where university practice treated the terms as applicable to employees. Still other states require that handbooks meet contract requirements of offer, acceptance, and consideration before they are enforceable."). *Compare Greene v. Howard Univ.*, 412 F.2d 1128, 1132 (D.C. Cir. 1969) (holding the university's handbook was impliedly incorporated as part of the employment agreement), *with Black v. W. Carolina Univ.*, 426 S.E.2d 733, 736 (N.C. Ct. App. 1993) (holding provisions of university's handbook were not part of professor's employment contract because they were not expressly incorporated into it). While it may be sound public policy to interpret a college handbook's tenure provisions as creating a contract with tenured faculty, and I would be inclined to do so in the proper case, I disagree with the majority's proclamation here—under the guise of a matter of law—where the very existence of the contract was consistently and vigorously disputed and was thus a matter for the jury to determine.

Moreover, the issue of whether the Faculty Manual constituted a contract was the most contested issue in this case, and the trial court was required to submit it to the jury, especially where, as here, the handbook contained a disclaimer that it did not constitute a contract of employment. *See Hessenthaler v. Tri-Cty. Sister Help, Inc.*, 365 S.C. 101, 108, 616 S.E.2d 694, 697 (2005) ("In most instances, judgment as a matter of law is inappropriate when a handbook contains both a disclaimer and promises."); *Horton v. Darby Elec. Co., Inc.*, 360 S.C. 58, 67, 599 S.E.2d 456, 460 (2004) ("An employee manual that contains promissory language and a disclaimer is 'inherently ambiguous,' and a jury should interpret whether the manual creates or alters an existing contractual relationship." (quoting *Fleming v. Borden*, 316 S.C. 452, 463, 450 S.E.2d 589, 596 (1994)); *see also* 19 Williston on Contracts § 54:10 (4th ed. 2016) ("[T]he determination [of] whether the manual establishes a contractual commitment depends on the intention of the parties, and since this is an inference of fact, the determination of the parties' intent is within the province of the jury. Relevant evidence of the intent of the parties for purposes of determining whether an employment manual created an implied employment contract usually includes the language of the manual itself, the employer's course of conduct, and pertinent oral representations."). *But see Bishop v. City of Columbia*, 401 S.C. 651, 658-59, 738 S.E.2d 255, 259 (Ct. App. 2013) ("An employee handbook forms a contract when: (1) the handbook provisions and procedures in question apply to the employee; (2) the handbook sets out procedures binding on the employer; and (3) the handbook *does not* contain a conspicuous and appropriate disclaimer." (emphasis added)). It is not the role of this Court to decide to whom a conspicuous disclaimer applies, as the majority erroneously attempts to do, because when a contract's existence is questioned and the evidence is conflicting, it becomes a question of fact for the jury.

The trial court thus properly submitted to the jury the issue of whether a contract existed as well as the terms of that contract. However, the jury was not asked, by way of special interrogatories, to specify the terms of the contract. Instead, the trial court complied with the parties' request that the jury—if it found that a contract existed—answer two questions, to wit, whether Erskine or Crenshaw breached that contract. From its verdict, we know the jury determined Erskine breached its contract with Crenshaw and that Crenshaw did not breach it. That verdict, if supported by the evidence, should be upheld. I believe the majority grievously errs in invading the province of the jury, declaring what it believes the terms of the contract to be, and then holding as a matter of law that Erskine did not breach its contract with Crenshaw. It also errs in its conclusion that Crenshaw, by not appealing his termination to the Board, failed to follow the terms of the contract. The jury found that Crenshaw complied with the provisions of the contract, and it is

neither the role of an appellate court to overrule the jury's factual findings regarding the terms of a contract nor its decision concerning a party's compliance therewith. *See Small*, 292 S.C. at 486, 357 S.E.2d at 455 (holding where the jury determined that the employee handbook altered the employee's at-will employment status, "courts will exercise the greatest self-restraint in interfering with the constitutionally mandated process of jury decision").

This jury determined that Crenshaw, as a tenured[17] faculty member, had enforceable rights and obligations as set forth in the Faculty Manual. That faculty handbooks can guarantee such due process and procedural rights is well established. *See Beilis v. Albany Med. Coll. of Union Univ.*, 525 N.Y.S.2d 932, 933 (N.Y. App. Div. 1988) ("It is well settled that a private educational institution is bound by its own published guidelines or rules."); Ralph D. Mawdsley, *Employment Issues in Private and Public Schools*, 51 Ed. L. Rep. 1107, 1116 (West 1989) ("[O]nce an educational institution prepares a handbook, employees have every right and expectation that it will be followed. A faculty member can expect that an institution will adhere to the procedural rights in the faculty handbook . . . ."). Even if I agreed with the majority's claim that Crenshaw possessed less due process rights because he was employed by a private institution, specific language in Erskine's Faculty Manual unequivocally grants him those rights. In the section governing termination, the Faculty Manual provides that, "the College will insure [sic] that both individual rights and its own institutional integrity are preserved through procedures that guarantee due process." Additionally, the handbook explicitly provides tenured faculty "the right of due process concerning their employment status" when contrasting their rights to those of non-tenured faculty. While the majority concedes

---

[17] The Faculty Manual defines "academic tenure" as providing for "continuous appointment of a faculty member to a designated teaching position." The majority expends considerable energy explaining the concept of tenure and states that tenure means something different with respect to faculty employed in private institutions of higher learning than those employed by public colleges and universities. In doing so, the majority focuses on the role of constitutional due process in the context of a private institution and creates a dispute where none exists, as this issue was never raised by Erskine in this case, nor did Crenshaw allege any such claim. Regardless, the majority's reliance on this public-private distinction is irrelevant because the Faculty Manual here specifically guaranteed enforceable due process rights to its tenured faculty. *McCall v. Finley*, 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct. App. 1987) ("Appellate courts recognize . . . whatever doesn't make any difference, doesn't matter.").

that the College references due process in its Faculty Manual, it completely ignores the legal ramifications of this incorporation in its stunning conclusion that Crenshaw "has no due process rights he may enforce against Erskine."[18] *See* William W. Van Alstyne, *Tenure: A Summary, Explanation and "Defense,"* 57 AAUP Bull. 328, 328 (1971) ("In a practical sense, tenure is translatable principally as a statement of formal assurance that thereafter the individual's professional security and academic freedom will not be placed in question without the observance of full academic due process. This accompanying complement of academic due process merely establishes that a fairly rigorous procedure will be observed whenever formal complaint is made that dismissal is justified on some stated ground of professional irresponsibility . . . ."); *id.* at 329 ("The more fundamental reason for the requirement of due process here as elsewhere is the desire to do justice and to avoid errors in the making of critical judgments."); *see also* Mark L. Adams, *The Quest for Tenure: Job Security and Academic Freedom*, 56 Cath. U. L. Rev. 67, 80 (2006) ("The nexus between academic freedom and the job security provided by tenure is the requirement that due process be provided prior to termination for cause, which preserves the foundational principle, guiding beliefs, and distinguishing

---

[18] The majority's repudiation of the College's obligation to provide due process to tenured faculty is unsupported, as *Jansen v. Emory University*, 440 F.Supp. 1060, 1062 (N.D. Ga. 1977) and *Centre College v. Trzop*, 127 S.W.3d 562, 567 (Ky. 2003) concerned the due process rights that a private college owes to its students, not its tenured faculty. *See Jansen*, 440 F.Supp. at 1062 (noting the university's bulletin provided attendance at Emory was a privilege and not a right). Moreover, neither of these cases rejected "the idea of contractual due process," as the majority boldly claims. Rather, the court's holdings in both *Jansen* and *Tzrop* centered on a specific clause of the contract providing the procedure for a student's dismissal. *See Jansen*, 440 F.Supp. at 1062 ("At any time the president or dean may terminate the enrollment or impose such measures as may be considered appropriate for improper conduct or for lack of sufficient progress."); *Tzrop*, 127 S.W.3d at 568 ("Although students are ordinarily disciplined through the judicial process involving the Student Judiciary or the executive committees of the Intrafraternity Council or the Panhellenic Association, the college administration may invoke sanctions including dismissal from the College in unusual circumstances."). The *Tzrop* decision further stemmed from the court's finding that the College "never guaranteed the right to due process" in its contract. 127 S.W.3d at 568. In contrast, nothing in the Faculty Manual allows Erskine College to circumvent the termination procedures guaranteeing due process for tenured faculty outlined in the handbook. As previously noted, the majority's reliance on *Jansen* and *Tzrop* is further misplaced because the applicability of constitutional due process is not at issue in this case.

characteristics of a liberal arts education at an academic institution: unfettered objective inquiry supported and challenged by reasoned analysis and discussion."). The jury properly found that by including these provisions in the Faculty Manual, Erskine guaranteed Crenshaw enforceable due process rights. To hold otherwise would render these provisions meaningless in contravention of the well-settled principles of contract law. 11 Williston on Contracts § 32:11 (4th. ed. 2012) ("Interpretations which give a contract meaning are preferred to those which render it meaningless."); 17A C.J.S. *Contracts* § 417 (2020) ("[A] court is bound to construe contracts so as to give effect to all provisions, whenever possible, and there is a presumption that the parties have not used words needlessly. A construction rendering a provision, term, or part meaningless . . . should be avoided."). I therefore reject the majority's assertion that Crenshaw has "no right of legal recovery" in this case and that the significance of tenure to Crenshaw's enforceable rights has been "overstated."

In its finding that the Board of Trustees is the only body with the power to terminate a tenured faculty member, the majority again intrudes upon the role of the jury by determining the terms of the parties' contract. It then contends that since President Norman did not have that power, any obligations Erskine College had under the contract did not arise because Crenshaw failed to request a hearing before the Hearing Committee. This entire discussion emanates solely from the majority's own interpretation of the handbook, something which I assert was an issue for the jury, not for this Court. Moreover, this conclusion, to which the majority attaches so much significance, was a point never argued or even mentioned by the College.[19]

---

[19] At the risk of being repetitive, many of the grounds on which the majority bases its decision as a matter of law were never raised during this lengthy litigation, and under settled principles, are not preserved. *See* Jean Hoefer Toal et al., Appellate Practice in South Carolina 382 (3d ed. 2016) ("[A]ppellate courts in this state, like well-behaved children, do not speak unless spoken to and do not answer questions they are not asked.") (quoting *Langley v. Boyter*, 284 S.C. 162, 181, 325 S.E.2d 550, 561 (Ct. App. 1984)); *see also* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal."); *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000) (noting when a party fails to raise an issue in the lower court or otherwise preserve it for appellate review, such contentions will not be considered on appeal); *Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review.").

While I deeply disagree with the majority arrogating to itself the power to determine the terms of the contract between the parties, I must also note that the majority is simply wrong in its conclusion on the power to terminate. Crenshaw was indeed terminated by President Norman, and when that event occurred, Crenshaw possessed a right to bring suit against the College for breach of contract based upon his alleged wrongful termination. *Hessenthaler v. Tri-Cty. Sister Help, Inc.*, 365 S.C. 101, 108, 616 S.E.2d 694, 697 (2005) ("[W]hen an employee's at-will status has been altered by the terms of an employee handbook, an employee, when fired, may bring a cause of action for wrongful discharge based on breach of contract."). I acknowledge that the termination procedures outlined in the Faculty Manual include an appeals process through which the decision of the Hearing Committee may be reviewed by the Board; however, nowhere is it stated that a tenured professor who fails to avail himself of that appeals process loses his due process right to file suit for breach of contract. Even though the majority elevates this provision to a mandatory requirement, which if not fulfilled, entirely vitiates Crenshaw's due process right to sue as well as his tenure rights generally, it cites no authority for this startling pronouncement, which I feel sure will come as quite a shock to tenured faculty throughout this state. The majority cites not one case from across the country where another court has found such a term controlling in the academic setting and states only that, "This way of looking at the point is akin to a person failing to exhaust administrative remedies."[20]

Contrary to the majority, courts across the country have recognized the value of tenure and the protection it affords to individual faculty with the clear and unmistakable understanding that such rights are "not easily forfeited." *McConnell v. Howard Univ.*, 818 F.2d 58, 68 n.11 (D.C. Cir. 1987). *See, e.g.*, R. Chait & A. Ford, Beyond Traditional Tenure 219–20 (1982); *see also White v. Bd. of Educ. of Lincoln Cty.*, 184 S.E. 264, 268 (W.Va. 1936) ("A teacher may not be lightly shorn of the privileges for which he fairly contracted."). The *McConnell* court further acknowledged that tenure rights are "*substantive* right[s] to continued employment that would exist with or without internal *procedures* for termination cases." *McConnell*, 818 F.2d at 68 n.11 (emphasis in original). Indeed, a college's internal

---

[20] The principle of exhaustion of remedies has no application here. *See Stinney v. Sumter Sch. Dist. 17*, 391 S.C. 547, 550 n.1, 707 S.E.2d 397, 398 n.1 (2011) ("The doctrine of exhaustion of administrative remedies only applies when a litigant invokes the original jurisdiction of the circuit court to adjudicate a claim based upon a statutory violation for which the legislature has provided an administrative remedy.").

procedures provide "an additional right of a tenured faculty member; one that serves the interests of *both* professors and universities by 'secur[ing] and maintain[ing] [an] environment essential to their own effectiveness.'" *Id.* (alterations and emphasis in original) (citing Commission on Academic Tenure in Higher Education, *Faculty Tenure* 33 (1973)).[21] In *McConnell*, the court found judicial review of the university's termination decision was not limited, for to limit review of such a decision would allow "one of the parties to the contract to determine whether the contract had been breached" and "would make a sham of the parties' contractual tenure arrangement." *Id.* at 68. *See also Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 862-63 (7th Cir. 2016) (holding a provision in the private college's handbook outlining internal review procedures did not prevent terminated professors from bringing their claims to court and noting "tenure would be an illusory benefit" if a terminated professor were prevented from filing suit to challenge the merits of the college's termination decision). The court further held, "[i]t would make no sense for a court blindly to defer to a university's interpretation of a tenure contract to which it is an interested party." *McConnell*, 818 F.2d at 69. *See also McAdams v. Marquette Univ.*, 914 N.W.2d 708, 718 (Wisc. 2018) (refusing to defer to the university's determination that it did not breach its contract with a tenured professor when it suspended him). Yet this is precisely what the majority does here.[22] The

---

[21] Despite Judge Buckley's statement in his concurrence that the academic principles in footnote 11 are "informational only," the D.C. Circuit's decision was clearly premised on the notion that tenure rights are substantive rights to continued employment regardless of a college's internal procedures. *McConnell v. Howard Univ.*, 818 F.2d 58, 67 (D.C. Cir. 1987) ("[A]ccording to the trial court, [the University's] decision to fire a tenured faculty member is largely unreviewable, with judicial scrutiny limited to a modest inquiry as to whether the [University's] decision was 'arbitrary,' 'irrational' or infected by improper motivation. Such a reading of the contract renders tenure a virtual nullity. Faculty members like Dr. McConnell would have no real *substantive* right to continued employment, but only certain *procedural* rights that must be followed before their appointment may be terminated. We find this to be an astonishing concept, and one not compelled by a literal reading of the Faculty Handbook." (emphasis in original)).

[22] Following Norman's termination letter to Crenshaw on September 7, 2011, the faculty executive committee met confidentially with President Norman and Dean Christie and decided that "the College followed the procedures for dismissal as outlined in the College Faculty Manual, and that Dr. Crenshaw's procedural rights have not been violated." The majority blindly adopts the College's interpretation of these events.

majority's actions in interpreting the provisions of the Faculty Manual and concluding as a matter of law that Crenshaw forfeited his right to challenge the College's termination decision not only constitute a misappropriation of the authority normally accorded to juries to determine the terms of a contract, but also deprive tenured faculty members of their due process rights. The majority has—as a matter of law—rendered Crenshaw's tenure an illusory benefit.[23] He has become merely an at-will employee who may be terminated at the whim of his employer.

Having expressed my deep dismay at the majority's decision to transform the issues of the existence of a contract and the delineation of its terms into a matter of law, I now turn to some of the voluminous evidence in this record that supports the jury's verdict.[24] First and foremost, the jury may well have found that the initial grievance against Crenshaw was without merit and should have been summarily dismissed by President Norman. As was clearly established at trial, William Crenshaw was a popular and beloved English professor at Erskine for decades, having been named Professor of the Year by the students and faculty on two

---

[23] The majority completely disregards the significance of tenure such that the protections provided in the College's Faculty Manual are meaningless, not only negating its intended purpose but perhaps depriving all tenured faculty employed by Erskine of this coveted benefit. Moreover, the College's continued insistence that the Faculty Manual did not create a contract between the parties—thereby rendering professors with tenure the same as those without it—should cause Erskine's tenured faculty significant concern about the security of their employment.

[24] I reject the majority's contention that I have engaged in wild speculation in reviewing whether there is any evidence to support the jury's decision. To the contrary, I believe I have faithfully followed the principles which accompany review of a trial court's grant of JNOV. *See, e.g.*, *Wilson v. Clark Atlanta Univ., Inc.*, 794 S.E.2d 422, 436-38 (Ga. Ct. App. 2016) (reviewing the record for evidence from which a jury could conclude the university breached its contract with professors and affirming the trial court's denial of JNOV). The majority's analysis assumes there was no dispute as to whether the Faculty Manual constituted a contract between Crenshaw and Erskine College and instead views the interpretation of the handbook's provisions—and any alleged breach thereof—as a question of law for the Court. My analysis does not focus on contract principles because that is not our role where the contract's very existence—and therefore its terms—were contested and became questions of fact for the jury. Using this proper lens, the analysis should be whether there is any evidence in this record which supports the jury's verdict. My "wild speculation" is merely the recounting of that ample evidence.

occasions. Significantly, he garnered that award during the same year—2010—that the events which gave rise to the initial grievance against him by members of the athletic department transpired. He also served with distinction on numerous faculty committees at the College, including, ironically, the faculty grievance committee at the same time he was the subject of a grievance lodged by members of the athletic department. Crenshaw was an active member, not only of the college community, but of the Due West community. He, along with his wife, served as a volunteer paramedic for eighteen years. It was through this work as a paramedic that he quickly recognized a potentially serious medical condition in one of his students during his 8:00 a.m. class on September 24, 2010. His summoning of an ambulance for her, without going through the athletic department, ostensibly violated "athletic department protocol," although that protocol was never produced to Crenshaw despite his numerous requests. Regardless of this purported protocol, the evidence presented could well have prompted the jury to conclude that Crenshaw acted in the best interest of the student, who was diagnosed with a minor brain injury or concussion after her arrival at the hospital that day. If indeed the initial grievance against Crenshaw was unwarranted, the jury could have found that the entire process from that point on was mishandled by Erskine and that the grievance was unfounded and should have been dismissed at its inception. This point cannot be overstated, as it was the origin of this entire matter resulting in Crenshaw's termination. The jury may well have decided that Crenshaw's conduct which precipitated the grievance simply did not rise to the level of "adequate cause" required for termination, and Erskine's decision to let the grievance go forward to Crenshaw's ultimate termination constituted a breach of contract.

Moreover, the jury could have determined that Erskine did not properly follow the procedures outlined in the Faculty Manual and thereby breached its contract with Crenshaw. First, the College forwarded the grievance to the faculty grievance committee to resolve the matter without providing its members with any direction on how the committee was to accomplish its task, thus preventing the committee from formulating a workable mediation plan. In so doing, the jury likely took into account that Norman had assumed the presidency of Erskine in 2010 at a young age, and that by the time of trial, he had already left that position.[25] The jury could have found that this failure constituted a breach by Erskine of the provision in the

---

[25] Dr. David Norman assumed the mantle of the presidency at Erskine College at the age of 34, and he resigned within three years of doing so, ostensibly, according to testimony presented at trial, after having strained or broken relationships in the Erskine community and finding himself unable to bring peace to the College.

handbook, which provides that the faculty grievance committee has the duty "to act as a mediator in cases where misunderstanding or unjust criticism may adversely affect either the professional reputation of a faculty member or the academic standing of the institution."  It is abundantly apparent from his actions in this case that Norman lacked the experience and institutional knowledge as to how to handle faculty grievances, but his failure to provide the faculty grievance committee with any direction was inexcusable, and the jury may have found his conduct in mishandling the process breached Crenshaw's contract with the College.

The jury may have also found the College's attempt to handle the grievance through an unprecedented special faculty committee constituted a breach of contract. Following several failed attempts at mediation,[26] Norman appointed a special faculty committee to "determine the extent of [Crenshaw's] culpability" regarding a number of charges that Norman alleged,[27] and he instructed the committee to make this determination based on a five-part scale: (a) Commendable behavior, (b) Compliant behavior, (c) Mishandled the situation, (d) Grossly mishandled the situation, or (e) Handled the situation in a way that severely limits Erskine's ability to carry out its mission.  Other than these instructions, Norman again did not provide the committee

---

[26] After the faculty grievance committee could not resolve the matter, Dean Christie offered Crenshaw and the athletic department complainants an opportunity to mediate the misunderstanding between them.  Crenshaw agreed, but the complainants refused, so no mediation occurred.  The jury could have found that the complainants' lack of good faith in refusing to engage in mediation should have resulted in Norman's dismissal of the complaint.

[27] Norman appointed a special committee and requested its help "in adjudicating this matter."  He cites Erskine's *Employee Resource Handbook* as his authority to create the committee, stating "The President retains the right to appoint a committee from time-to-time to hear grievances and appeals."  This handbook is different from the Faculty Manual at issue in this case and was not provided to us in the record on appeal.  In his letter to the special committee, Norman outlined the possible offenses Crenshaw committed as follows: (1) Handling of an emergency situation involving an injured student athlete displaying abnormal behavior in the classroom; (2) Treatment of emergency personnel including student's emergency contact; (3) Professionalism and collegiality towards other faculty at the point of crisis; (4) Professionalism and collegiality in the aftermath of the crisis; and (5) Respect for the grievance committee and evidence of respect for faculty governance and the policies and procedures of Erskine College and Seminary.

with any procedures to conduct its inquiry. The jury may have determined that this failing constituted a breach of Erskine's contract with Crenshaw.

At the special committee hearing, Crenshaw and members of the committee disagreed about the procedures and the nature of the committee's task, and they received no guidance from Norman. Crenshaw was reluctant to respond to questions posed to him by the committee without the presence of legal counsel, and he continued to request that he be provided with the actual charges and the evidence against him—quintessential due process rights. The jury could have determined the grievance procedures outlined in the Faculty Manual were not followed, and Norman's failure to provide both the initial grievance committee and the special adhoc committee with specific procedures to resolve the matter, as well as the failure to provide Crenshaw with the actual charges and the evidence against him, constituted a breach of Erskine's contract with Crenshaw. Instead, the instructions Norman did provide the committee—to essentially adjudicate the issue by grading Crenshaw's culpability on a five-part scale—are not contained anywhere in the Faculty Manual and had not previously been used at Erskine to resolve a grievance matter. Accordingly, the jury could have found Norman's use of a special committee in this manner denied Crenshaw the due process afforded under the Faculty Manual and breached Crenshaw's contract with the College.

The timing of this entire affair is also significant and could have been a basis for the jury to find Erskine breached its contract with Crenshaw. The incident involving the student requiring medical attention happened in September, and the faculty grievance committee and the special committee appointed by Norman met later that same year. Eight months then elapsed with no action being pursued by the College, and Crenshaw was assigned to teach classes for the 2011 fall semester. At that point, Crenshaw may well have believed that the matter was behind him. However, on the very first day that Crenshaw began classes with his new freshman students, he was unexpectedly confronted by Norman, who asked to meet with him immediately following his first class that morning.

At this meeting, rather than engage in a conversation with Crenshaw, Norman read aloud a letter he had written which stated his intention to terminate Crenshaw's employment and the grounds for his dismissal. In pertinent part, Norman read:

> Your considerable lack of civility and collegiality combined with your toxic levels of personal arrogance, defensiveness and demonstrated disdain for the policies and procedures put in place to define and defend

our academic community has demonstrated itself in "personal conduct which substantially impairs your fulfillment of institutional responsibilities" . . . . [T]hey are grounds for your dismissal.

While Crenshaw's response to this unanticipated and oddly-timed recitation was somewhat less than cordial, the conduct of Norman and Crenshaw on this fateful day vis-à-vis the contract was an issue for the jury to determine. First and foremost, the reasons given by Norman as grounds for this dismissal bear no resemblance to the original grievance filed against Crenshaw, which likely did not escape the jury's notice. Inexplicably, Norman provided Crenshaw with only one option to avoid termination, which was to make blanket apologies to the grievance complainants, the faculty at large, and the Erskine College community. Taken aback by this unorthodox request, Crenshaw asked what he needed to apologize for, and Norman replied that he had offended his colleagues and had a strained relationship with them.[28] However, Norman also acknowledged that he could be wrong, that Crenshaw had not offended the faculty, and that he would know for sure based upon the faculty's response to his apology. Given this evidence, the jury could have found Norman's delayed confrontation with Crenshaw, as well as the morphing of the original grievance into a personal attack by Norman, did not satisfy the requirement for preliminary proceedings in the Faculty Manual, and the manner in which Norman sought to resolve the matter was not only unprofessional, but also constituted a breach of Erskine's contract with Crenshaw.

Prior to the end of the meeting, Norman informed Crenshaw that he was suspended from teaching for the semester. Under the terms of the Faculty Manual, a tenured professor may be suspended from teaching during termination proceedings "only if immediate harm to himself or others is threatened by his continuance." The jury may well have concluded that Erskine breached this term of the contract through Norman's actions on that day. In a similar case, the Wisconsin Supreme Court found Marquette University—also a private religious institution—breached its contract with a tenured professor when it suspended him because of a blog post criticizing an encounter between an instructor and a student. *McAdams v. Marquette Univ.*, 914 N.W.2d 708, 737 (Wisc. 2018). The court found the suspension constituted a breach of contract because the activity was protected by the contract's guarantee of academic freedom. *Id*. at 735. Indeed, the court held that "[a] university's academic

---

[28] Crenshaw's bewilderment concerning the alleged need for him to apologize to his colleagues and that he had a "strained relationship" with them is understandable given the fact that the faculty had voted him Professor of the Year during the very year the initial grievance arose.

freedom is a shield against governmental interference" and criticized the dissent's willingness to "reforge it as a sword with which to strike down contracts [the University] no longer wishes to honor." *Id*. at 737. Similar to *McAdams*, Crenshaw's conduct throughout this matter was protected by Erskine's Faculty Manual which guarantees academic freedom for faculty and defines the term as "freedom of thought and expression within the institution: freedom to explore, to criticize, to exchange ideas, and to communicate the result of honest and responsible inquiry." Accordingly, the jury could have found the suspension from teaching constituted a breach of contract because Crenshaw's conduct did not rise to the level of "immediate harm to himself or others" as required by the Faculty Manual.

At the end of the meeting, Norman asked Crenshaw to let him know two days later which of the following options he decided to choose: (1) apologize; (2) retire early; or (3) proceed with termination. Crenshaw complied with Norman's request in an email indicating his willingness to discuss early retirement with his attorney. However, Norman interpreted Crenshaw's response to be a final decision to proceed with early retirement, immediately drafted an agreement and announcement for Crenshaw's approval, and requested his response by the following day—despite the fact that Crenshaw was guaranteed by law twenty-one days in which to consider the offer. Crenshaw responded that announcing his retirement was premature, and Norman reiterated that he was suspended from teaching and that he had to make a decision immediately. Four days after Crenshaw's initial reply, Norman instituted formal termination proceedings against Crenshaw because, in his view, they had not been able to "resolve the matter by mutual consent" according to the Faculty Manual. Nevertheless, Norman indicated the early retirement offer was still on the table, but at the same time, informed Crenshaw of the grounds of his dismissal and his right to a hearing before a faculty committee. Norman provided Crenshaw only three days to notify him of his desire for a hearing.

While the Faculty Manual does not require a specific length of time for each stage of the termination proceedings, the jury could have found Erskine unnecessarily rushed the process when—after allowing eight months to pass without taking any action—Norman escalated the proceedings to stage two and scheduled the hearing a mere two weeks later. The jury could have also determined Norman further confused and bungled the process by granting Crenshaw time to consider early retirement while at the same time threatening him with termination and mandating his suspension from teaching. Although Norman proceeded with scheduling a hearing and testified he actually appeared on the date of the scheduled hearing, the jury could well have found this hearing to be a sham since no committee was appointed to hear the case as required by the Faculty Manual. Obviously, even

if Crenshaw had appeared that day, no hearing could have been held without an adjudicative body. Thereafter, Norman took the extraordinary step of banning Crenshaw from campus, even though his home was essentially located there. The jury may have determined that this severe measure breached Erskine's contract with Crenshaw since there is no provision in the Faculty Manual which authorizes the president to ban a tenured professor from stepping foot on the Erskine campus.

Finally, the jury could have found Erskine's notification of Crenshaw's right to a hearing was itself confusing and ambiguous because the letter stated that a hearing would be held unless waived, provided a date, time, and location for the scheduled hearing, but also asked that he reply if he desired the hearing. *See Williams v. Teran, Inc.*, 266 S.C. 55, 60, 221 S.E.2d 526, 529 (1976) (noting that any doubt in a contract must be resolved against the drafting party); *Mid-Continent Refrigerator Co. v. Way*, 263 S.C. 101, 104-05, 208 S.E.2d 31, 32 (1974) (noting that ambiguities or conflicts in documents constituting a contract must be construed against the party who drafted the contract). Because Norman had offered Crenshaw early retirement and allowed him twenty-one days to consider the offer, the jury could have found he was not required to request a hearing because he was still in the preliminary negotiation stage of the process, and an agreement to accept early retirement would have constituted a resolution of the matter "by mutual consent" under the Faculty Manual.

These numerous factual issues, among others, were peculiarly the province of the jury chosen to resolve this case. The position taken by the majority—that the presence of factual questions are irrelevant because the contract between the parties required Crenshaw to avail himself of the appeals process prior to filing suit—can only be justified by the majority arrogating to itself the task of determining the terms of the contract, a matter which I insist was properly submitted to the jury. In fact, whether the Faculty Manual created a contract was one of the most hotly disputed issues in this case, and it was the threshold issue the jury was required to determine. This point—which is the main thrust of my separate writing—bears repeating: not only does the majority usurp the jury's role in deciding the terms of the parties' contract, it also errs in its determination because absolutely nothing in the Faculty Manual—a manual designed to guarantee tenured professors certain rights of due process which the majority essentially dismisses as meaningless—provides that a failure to request a hearing forfeits the professor's right to bring a lawsuit for breach of contract. Therefore, any alleged procedural failure on Crenshaw's part did not— and indeed cannot—end this case as a matter of law. Issues regarding the existence of a contract, its terms, and whether a breach has occurred have historically been issues for a jury, and they should be in this case. The majority's remarkable departure

from this longstanding principle of appellate practice and procedure is wrong, and it effectively destroys the concept of academic tenure in this state. With the stroke of a pen, the majority has essentially transformed a tenured professor with a distinguished career spanning over thirty years into an at-will employee, despite the clearly supportable verdict of a jury in his favor.

Accordingly, I would affirm the decision of the court of appeals reinstating the jury's verdict and awarding Crenshaw $600,000 damages for his breach of contract claim.

**BEATTY, C.J., concurs.**